IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————————

Nos. 24-4308, 24-4325

—————————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

CRISTIAN ARIEL AREVALO ARIAS, A/K/A SERIO,
MARVIN MENJIVAR GUTIERREZ, A/K/A ASTUTO,

*Appellants.*

—————————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria
*The Honorable Leonie M. Brinkema, District Judge*

—————————————

BRIEF OF THE UNITED STATES

—————————————

Erik S. Siebert
United States Attorney

Jacqueline R. Bechara
John C. Blanchard
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

Matthew K. Hoff
Deputy Chief

Violent Crime & Racketeering Section
United States Department of Justice

1301 New York Avenue, N.W.
Washington, D.C. 20005
(202) 514-3594

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities ................................................................... iv

Introduction ................................................................................1

Issues Presented ..........................................................................2

Statement of the Case..................................................................3

    A.    The STLS clique of MS-13. .................................................3

    B.    Menjivar and Canales order members of the clique to commit
         murders. ...........................................................................5

    C.    Defendants kill Milton Beltran Lopez and Jairo Geremeas
         Mayorga..............................................................................5

    D.    Defendants tell others about the double murder. ..................9

    E.    Arevalo and other STLS members kill Eric Tate.................11

    F.    STLS members kill Antonio Smith......................................13

    G.    Molina confesses to the double murder, then recants. .........14

    H.    Vasquez pleads guilty and is removed from the United States..........16

    I.    The district court grants the government's motion to limit the
        cross-examination of Guevara...........................................18

    J.    The district court denies defendants' motion to dismiss the
        indictment for due-process violations. .................................21

    K.    The district court prohibits the government from calling Molina
        to testify at defendants' trial...............................................23

    L.    A jury finds defendants guilty at trial. ................................23

i

1. The government presents its case-in-chief.................................24

2. Defendants present evidence...........................................24

3. The parties deliver closing arguments. ...........................27

4. The district court denies defendants' motions for severance and a mistrial..........................................31

M. The district court denies defendants' post-trial motions and sentences defendants to life imprisonment. ...........................32

Summary of Argument ................................................34

Argument.......................................................36

I. The district court did not abuse its discretion in limiting the scope of defendants' cross-examination of Guevara. ................................36

A. Guzman's disputed allegations were not proper grounds for cross-examining Guevara....................................39

B. The district court appropriately exercised its discretion to exclude the evidence under Rule 403.................................45

C. Any error was harmless................................................47

II. The district court did not err in denying defendants' motion to dismiss the indictment for due-process violations.................................49

A. Vasquez's removal from the United States did not violate due process. ................................................50

B. The failure to preserve Molina's jail calls did not violate due process. ................................................58

C. Prohibiting Molina from testifying remedied the late disclosure of the tipster's name and contact information....................................62

III.    The district court did not abuse its discretion in denying defendants'
        motions for a mistrial and for a new trial. .......................................64

IV.     The district court did not err in declining to set aside the jury's special
        finding on Count One. ......................................................................73

Conclusion .......................................................................................................77

Statement Regarding Oral Argument ...............................................................78

Certificate of Compliance ................................................................................78

# Table of Authorities

**Page**

## Cases

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ..................................................... 56, 58

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................. 23, 34, 61

*Bruton v. United States*, 391 U.S. 123 (1968) ........................................67

*California v. Trombetta*, 467 U.S. 479 (1984)..........................................58

*Davis v. Alaska*, 415 U.S. 308 (1974)......................................................36

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)............................ 36, 37, 38, 47

*Muhammad v. Kelly*, 575 F.3d 359 (4th Cir. 2009) .................................59

*Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385 (1972)................75

*Quinn v. Haynes*, 234 F.3d 837 (4th Cir. 2000)......................................37

*Richardson v. Marsh*, 481 U.S. 200 (1987) ...................................... 66, 67

*Samia v. United States*, 599 U.S. 635 (2023) ..........................................66

*Strickler v. Greene*, 527 U.S. 263 (1999) ..............................................51

*United States v. Abbas*, 74 F.3d 506 (4th Cir. 1996) ...............................50

*United States v. Agofsky*, 516 F.3d 280 (5th Cir. 2008) ...........................75

*United States v. Ayala*, 601 F.3d 256 (4th Cir. 2010)....................... 38, 73

*United States v. Benson*, 957 F.3d 218 (4th Cir. 2020) ............................66

*United States v. Bynum*, 3 F.3d 769 (4th Cir. 1993)......................... 37, 41

*United States v. Capers*, 61 F.3d 1100 (4th Cir. 1995) ............................48

*United States v. Chaparro-Alcantara*, 226 F.3d 616 (7th Cir. 2000).....................56

*United States v. Chavez*, 894 F.3d 593 (4th Cir. 2018) ............................61

*United States v. Chong Lam*, 677 F.3d 190 (4th Cir. 2012) ............................ 64, 72

*United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989) ............................45

*United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992) ....................43

*United States v. Damra*, 621 F.3d 474 (6th Cir. 2010)..............................56

*United States v. Dennis*, 19 F.4th 656 (4th Cir. 2021)...............................3

iv

*United States v. Dorlouis*, 107 F.3d 248 (4th Cir. 1997)........................................64

*United States v. Dring*, 930 F.2d 687 (9th Cir. 1991) ...............................................57

*United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994)...............................................43, 73

*United States v. Garcia*, 405 F.3d 1260 (11th Cir. 2005) (per curiam)..................63

*United States v. Green*, 599 F.3d 360 (4th Cir. 2010) ............................................72

*United States v. Gross*, 961 F.2d 1097 (3d Cir. 1992)............................................75

*United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999).......................................45

*United States v. Hastings*, 126 F.3d 310 (4th Cir. 1997)......................................63

*United States v. Hill*, 322 F.3d 301 (4th Cir. 2003).........................................41, 46

*United States v. Hunt*, 99 F.4th 161 (4th Cir. 2024)..............................................74

*United States v. Iribe-Perez*, 129 F.3d 1167 (10th Cir. 1997)...............................56

*United States v. Kaixiang Zhu*,
 854 F.3d 247 (4th Cir. 2017) (per curiam) ..............................................passim

*United States v. Kelly*, 510 F.3d 433 (4th Cir. 2007)..............................................48

*United States v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012)..........................56

*United States v. Legins*, 34 F.4th 304 (4th Cir. 2022) ...........................................74

*United States v. Leisure*, 844 F.2d 1347 (8th Cir. 1988).......................................53

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010).........................63, 67, 69, 70

*United States v. Louthian*, 756 F.3d 295 (4th Cir. 2014).......................................74

*United States v. Marshall*, 872 F.3d 213 (4th Cir. 2017) .......................................36

*United States v. Matthews*,
 373 F. App'x 386 (4th Cir. 2010) (per curiam)..............................................59

*United States v. McCarty*, 82 F.3d 943 (10th Cir. 1996).........................................41

*United States v. McClure*, No. 90-5001,
 1990 WL 180122 (4th Cir. Nov. 21, 1990) (per curiam) ...............................60

*United States v. Merritt*, No. 96-4149 (L),
 1998 WL 196614 (4th Cir. Apr. 22, 1998) (per curiam)...............................63

*United States v. Montieth*, 662 F.3d 660 (4th Cir. 2011)........................................60

*United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004) .....................................50

*United States v. Najjar*, 300 F.3d 466 (4th Cir. 2002)...................................... 69, 70

*United States v. Pérez-Vásquez*, 6 F.4th 180 (1st Cir. 2021).................................67

*United States v. Perry*, 92 F.4th 500 (4th Cir. 2024)...............................................58

*United States v. Portsmouth Paving Corp.*,
    694 F.2d 312 (4th Cir. 1982) ...........................................................................46

*United States v. Powell*, 469 U.S. 57 (1984) .................................................... 74, 75

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005)...........................................40

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997)...........................................45

*United States v. Rabinowitz*, 578 F.2d 910 (2d Cir. 1978) (per curiam) ...............41

*United States v. Ramirez-Castillo*, 748 F.3d 205 (4th Cir. 2014).........................76

*United States v. Smith Grading & Paving, Inc.*,
    760 F.2d 527 (4th Cir. 1985) .................................................................... 61, 62

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013) ........................................62

*United States v. Thomas*, 900 F.2d 37 (4th Cir. 1990) ...........................................74

*United States v. Tindle*, 808 F.2d 319 (4th Cir. 1986)...................................... 44, 48

*United States v. Tinsley*, 800 F.2d 448 (4th Cir. 1986) (per curiam) .....................74

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) ....................................49

*Zafiro v. United States*, 506 U.S. 534 (1993) .................................................... 68, 70

**Constitutional Provisions**

U.S. Const. amend. VI ...................................................................................... 36, 49

**Other Authorities**

Joint Appendix, *United States v. Sagastizado et al.*,
    No. 24-4251 (L) (4th Cir. Oct. 21, 2024), Doc. No. 43-4 ............................62

**Rules**

Federal Rule of Criminal Procedure 29 ............................................................ 31, 72

Federal Rule of Evidence 403.............................................................. 20, 38, 44, 45

Federal Rule of Evidence 404................................................................... 20, 37, 42

Federal Rule of Evidence 608 .................................................... 20, 37, 41

Federal Rule of Evidence 611 ................................................................ 20

**Introduction**

Defendant Marvin Menjivar Gutierrez ("Menjivar") was the leader of the Sitios Locos Salvatrucha ("STLS") clique of MS-13 in the United States, and defendant Cristian Ariel Arevalo Arias ("Arevalo") was a lower-ranking member of the clique. In the spring of 2019, Menjivar and his second-in-command ordered members of the gang to commit murders so that their subordinates would get promoted and the clique could expand its territory. A series of brutal murders in northern Virginia soon followed.

In June 2019, Arevalo, Mario Antonio Guevara Rivera ("Guevara"), and Carlos Jose Turcios Villatoro ("Turcios") lured Milton Beltran Lopez, whom they suspected to be a rival gang member, and Jairo Geremeas Mayorga, his friend who happened to be in the wrong place at the wrong time, to a wooded area. Arevalo and his confederates shot and stabbed Beltran, shot Mayorga, and left both men for dead. Next, in August 2019, Arevalo, Abner Molina Rodriguez ("Molina"), and two other MS-13 members went out on a mission to commit a murder. They selected Eric Tate, a total stranger, as their target and shot him to death outside an apartment complex. Finally, in September 2019, Guevara, Molina, and another MS-13 member went out on a mission. The men saw Antonio Smith, another random target, walking down the sidewalk and shot him to death.

1

Arevalo and Menjivar proceeded to trial with Turcios, where a jury found them guilty of conspiracy, drug, and murder offenses. Defendants raise four challenges to their convictions in this appeal. First, defendants claim the district court abused its discretion in preventing them from cross-examining Guevara about allegations raised by his ex-girlfriend. Second, defendants contend the district court should have dismissed the indictment based on the pretrial removal of an illegal-alien witness from the United States, the failure to preserve Molina's jail calls, and the late disclosure of a tipster's name and contact information. Third, defendants argue they were entitled to a mistrial or new trial based on Turcios's improper closing argument. Finally, Arevalo claims the district court should have set aside the jury's special finding that, as part of the racketeering conspiracy, he murdered Tate. The experienced district judge considered and disposed of each claim based on her firsthand assessment of the events of this case. Because none of those rulings constitutes reversible error, the Court should affirm.

## Issues Presented

1.     Did the district court abuse its discretion in limiting the scope of defendants' cross-examination of Guevara?

2.     Did the district court err in denying defendants' motion to dismiss the indictment for due-process violations?

2

**3.** Did the district court abuse its discretion in denying defendants' motions for a mistrial and for a new trial based on Turcios's closing argument?

**4.** Did the district court err in declining to set aside the jury's special finding regarding Arevalo's liability for Tate's murder?

**Statement of the Case**

**A.    The STLS clique of MS-13.**

Viewed "in the light most favorable to the government, evidence adduced at trial established the following facts." *United States v. Dennis*, 19 F.4th 656, 660 (4th Cir. 2021). Defendants were members of STLS, a clique of MS-13. JA834. MS-13 is an international criminal organization, and its leadership is located in El Salvador. JA1258, JA1488, JA1756. In the United States, members are "primarily" "recent immigrants." JA1762.

Membership in STLS followed a well-established rank structure. The lowest rank was paro, JA842, a person who performed functions such as acting as a "lookout to see if there were people or police," JA1433. The next rank was observación, at which point a person had to "sell drugs, get money, account for the money," and "account for the people" in the clique. JA843. To rank up to chequeo, a member had to "[k]ill a person such as a rival" gang member, or "chavala." JA843; *see* JA721. Finally, a person could become a homeboy, the highest rank, by killing three people. JA844.

3

In the spring of 2019, Menjivar, also known as "Astuto," and Melvin Canales Saldana ("Canales"), also known as "Demente," were homeboys, JA844, while Arevalo, also known as "Serio"; Turcios, also known as "Oculto"; Guevara, also known as "Blue"; and several other STLS members were observaciones, JA858. Menjivar was the first word, or leader, of STLS in the United States, and Canales was the second word, or second in command. JA844. Menjivar lived in New York, while Canales mainly spent his time between Maryland and Virginia. JA1254. Menjivar told Guevara that ultimate decisions on behalf of the clique were up to Menjivar. JA1047–1048.

STLS engaged in criminal activity, including selling drugs, buying and selling weapons, murder, and beating members and associates who did not follow the gang's rules. JA850–851. STLS members had to pay dues and attend meetings. JA844, JA849. Menjivar usually participated by phone but occasionally attended the meetings in person. JA1490–1491.

Around late 2015, the clique started selling marijuana and cocaine. JA851. Gang leadership in El Salvador funded the initial purchases of drugs, and Menjivar provided drugs to other STLS members to sell. JA851; *see* JA1440. Walter Lemus ("Lemus"), a former member of STLS, saw Menjivar bring cocaine to a hotel in New York where Canales and Manilester Andrade Rivas ("Andrade"), also known as "Mani," were present, then blend the cocaine into a powder and package it into

baggies. JA1441–1442. Lemus also saw Arevalo, among other STLS members, selling drugs. JA1443.

### B. Menjivar and Canales order members of the clique to commit murders.

In the spring of 2019, Menjivar and Canales ordered the observaciones to "[s]tart killing people to go up in rank" and gave their subordinates three months to fulfill this order. JA860–861. Menjivar and Canales had spoken to STLS leadership in El Salvador, who approved this order. JA1361. Menjivar and Canales "had to find out who [the observaciones] were going to kill and agree to that." JA862.

Following this order, Andrade, Arevalo, Guevara, Molina, Turcios, and Wilmer Cabrera ("Cabrera"), also known as "Wiso," started "going out with weapons looking for some people to kill," specifically, rival gang members. JA862. They "already had specific people" in mind, but if that "didn't happen," they "would go to other locations where there were rival gangs" and look for people "in the street" whom they could kill. JA862. They also "check[ed] the areas to see if there were any cameras or police presence." JA863.

### C. Defendants kill Milton Beltran Lopez and Jairo Geremeas Mayorga.

Guevara learned from Arevalo that Milton Beltran Lopez ("Beltran") was a member of a rival gang, the Sureños. JA920. Arevalo had heard that Beltran drunkenly approached a group of people from the Pinos Locos Salvatrucha clique of

MS-13, not knowing they were in a gang, and "started saying" he "was a Sureño" and "wanted to start growing his gang." JA921. "[B]y then," STLS was "looking for people to kill," so Beltran "became part of the list." JA921. Menjivar directed Arevalo and Guevara to investigate Beltran "to make sure that he was a Sureño." JA922.

Arevalo worked to gain Beltran's trust, including by hanging out with him and giving him money to buy beer. JA1289. Eventually, Arevalo recorded Beltran saying that "he was a Sureño" and sent the recordings to Menjivar. JA922. Menjivar then requested permission from gang leadership in El Salvador, who confirmed the clique "could take action" against Beltran. JA923. It took time for the clique to locate Beltran. JA923. They looked for Beltran in locations he was known to frequent in Woodbridge. JA923. In a May 21, 2019, conversation, Guevara asked Arevalo, "What about the hen that [Turcios] said was over by La Americana?" JA3698. Guevara later explained the "hen" he was referring to was Beltran. JA930. La Americana was a grocery store in Woodbridge. JA924, JA1297.

On the night of June 21, 2019, Arevalo, Guevara, and Turcios decided to "go out and look for" Beltran. JA955. Arevalo and Turcios picked Guevara up from a restaurant, then Arevalo drove until they reached a gas station across from La Americana. JA956. Arevalo exited the car, explaining that he was going to fill it with gas and buy a few things, and told Guevara and Turcios to stay in the car "so

6

the cameras wouldn't catch" them.  JA956.  When Arevalo returned, he told Guevara and Turcios that "he had heard a voice that sounded like [Beltran]'s behind the trashcan of the gas station."  JA956.  Arevalo went "and confirmed," then told Guevara and Turcios "that [Beltran] was in fact there."  JA957.

The trio initially decided to park behind the gas station and murder Beltran there.  JA957.  But they reconsidered and decided that, to avoid being seen, Arevalo would drop Guevara and Turcios off at a wooded location in Woodbridge and Arevalo "would go pick up [Beltran] and bring him with the ruse that [they] were going to give [Beltran] drugs."  JA957.  Accordingly, Arevalo left Guevara and Turcios in the woods, and Arevalo "went back to pick up [Beltran]."  JA957.

Guevara waited in the woods with Turcios.  JA958.  Arevalo sent Guevara a message saying he had picked up Beltran and "there was one other person with him in the car."  JA958.  They "started discussing with [Turcios] what was going to happen, and [they] decided that [they] would kill" both Beltran and his friend, later identified as Jairo Geremeas Mayorga ("Mayorga").  JA958.  They reasoned that, "if that person was hanging out with a rival, he probably was a rival," JA958, and Beltran had "said that he wanted to grow his gang," JA959.  Plus, if they were going to kill Beltran, they "could not leave the other person alive" because he would be a witness who could report them to the police.  JA959.

7

Turcios told Guevara "to give him the firearm because he wanted to shoot first," and Guevara complied. JA959. Eventually, Arevalo arrived with Beltran and Mayorga. JA959–960. Guevara and Turcios "greeted them just with fist bumps because [they] didn't want to leave any trace." JA960. Part of the ruse was that Guevara would give Beltran and Mayorga drugs, so when they arrived, Guevara pretended to be on the phone. JA960.

When he returned to the group, Guevara watched as Turcios "shot [Beltran] in the face." JA960. Beltran "fell immediately, and when he fell," Turcios "shot him again." JA960. Mayorga, who "had been sitting down," "screamed and ran" toward the street. JA960. Turcios shot Mayorga "once, and he fell to the ground." JA960. Guevara then asked Turcios for the gun, and Guevara started shooting Beltran. JA961. Guevara saw Mayorga get up and start running, so Guevara "fired twice" at Mayorga, "and he fell to the ground." JA961. Guevara shot Beltran again, and then Arevalo "started stabbing" Beltran. JA961. Arevalo "said that he also wanted to shoot," so Guevara "handed the weapon" to Arevalo, and Arevalo "shot at [Beltran], too." JA961.

Arevalo, Guevara, and Turcios "ran out of the woods towards the car that was parked on the street." JA961. Arevalo made a U-turn to avoid being detected by security cameras at La Americana or at the traffic light. JA962. While they were in the car, they "flashed the gang sign" because they had "killed those people." JA962.

8

### D.     Defendants tell others about the double murder.

The next morning, Guevara was late for work.  JA1148.  He worked as a painter with Juan Manuel Vasquez Reyes ("Vasquez"), also known as "Guero."  JA1148.  When Guevara arrived at work, he was carrying the gun used to kill Beltran and Mayorga hidden in a paint can.  JA1148.  Guevara told Vasquez about the murders and showed him the gun, then left the paint can at the work site overnight.  JA1148–1149.  The next day, Vasquez and their boss brought the paint can to Guevara at his house.  JA1149.  Vasquez loaned Guevara a grinder to destroy the gun.  JA1149.

On June 22, 2019, Menjivar asked Guevara to "[m]ake a report about that and send it to me."  JA3766.  Guevara responded with a message summarizing the double murder.  JA3767.  Menjivar said the report was "so-so."  JA3768.  He added, "be careful and let me know if anything happens."  JA3768.  The next day, Guevara asked Menjivar what to change.  JA3777.  Menjivar gave Guevara specific edits, JA3777, JA3785, and Guevara followed up with two subsequent drafts of the report, JA3784, JA3786.

Guevara also shared the following draft of the report with Arevalo:

> In the area fifteen, a mishap occurred.
> In the Virginia area, on July 22, 2019, Serio, Blue, and Oculto went out for a ride, it was then when they saw a Chavala that we had on the list—
> — because he once belonged to the Tinys Locos Sureños. Then, that Chavala, whom we were watching came out with another one, so two Chavalas were processed that day.
> Up to this moment, everything turned out great.

JA3841.[1]  Arevalo replied, "It's fine, just review it again and correct the misspelled words."  JA3842.

Arevalo, Menjivar, and Guevara discussed killing Beltran's brother because, "through his social media, it looked like he was involved with gangs."  JA1035.  On June 29, 2019, Menjivar left Guevara a message saying that "fliers were being distributed looking for people who would give information" to the police about the double murder, in return for "a reward."  JA1036; *see* JA3825.  Menjivar added that Beltran's brother "said that it was those locos of [] La Mara Salvatrucha who had done it."  JA1036.

Later that summer, Karen Figueroa, Andrade's wife, overheard Andrade talking on the phone to Guevara.  JA1618.  Guevara told Andrade that "he had two bodies on him."  JA1619.  Guevara described how Arevalo "was with these two

---

[1] The reference to July 22, rather than June 22, "was a mistake."  JA979.

gentlemen," "told them that he knew where they could get drugs," and said "he had to pick up" the drugs from Guevara. JA1619. Arevalo "got in the car with these two gentlemen and drove them to" Guevara, who was waiting "behind [a] convenience store." JA1619. They "shot one," and "the other one tried to run, so then they shot him as well." JA1619.

### E.     Arevalo and other STLS members kill Eric Tate.

On August 29, 2019, Guevara received a message from Canales asking about a pistol that belonged to Guevara and Jairo Aguilera Sagastizado ("Aguilera"). JA1007. Canales told Guevara "the other locos from the clique were going to go out and do a hit," JA1007, and instructed Guevara "to pass the firearm," JA1008. Guevara gave Arevalo the gun in the parking lot across from the house where Guevara lived with his girlfriend, Keyly Guzman ("Guzman"). JA1012.

Arevalo told Guevara about how, that night, Andrade, Arevalo, Cabrera, and Molina used the gun to murder "a dark-skinned person," later identified as Eric Tate. JA1014. Arevalo recounted that "they had gone around the apartments located behind La Americana." JA1013. Guevara, Arevalo, Turcios, and others had previously visited that area several times looking for "someone in the street that [they] could kill." JA1013.

Andrade, Arevalo, Cabrera, and Molina were "waiting for something to happen when an orange car came into the apartments." JA1014. Arevalo saw a

person "walking on the street" and determined "he looked suspicious." JA1014. Andrade and Arevalo "started following that person on the side of the road," walking behind parked cars. JA1014. Arevalo had a gun in his hand. JA1015. The man, Tate, had walked toward La Americana, then turned around and started walking back. JA1014. As Tate approached, Arevalo "started walking by the cars so [Tate] would not see him." JA1015. Andrade was behind Arevalo and "started grabbing" Arevalo by his shirt, but Arevalo "shov[ed] his hand off." JA1015.

After Tate passed, Arevalo emerged from behind the cars. JA1015. Arevalo started shooting Tate in the back and Tate "fell to the ground." JA1015. Andrade came over to them, and Arevalo "handed over the gun." JA1015. Andrade "stopped cold, he didn't know what to do." JA1015. Arevalo said that he "shook his hand and said, dog, shoot." JA1015. Andrade then "reacted and started shooting." JA1015. After Andrade shot Tate "a few times," Andrade "tried to start running," but Arevalo told Andrade to "[c]ome back" because Tate was "still alive." JA1015. Arevalo said Tate "took out a gun and started shooting, too." JA1015. Andrade "shot him again," and when Andrade "finished shooting," he and Arevalo "went towards some bushes." JA1015–1016.

Molina returned with a weapon and shot Tate "once" until Tate "was on the ground." JA1016. Cabrera "had a blade" and "wanted to stab" Tate, but the others "said, no, no, let's go." JA1016.

12

After Tate's murder, Andrade, Cabrera, and Molina were promoted to chequeo. JA1031. Sometime in 2019, Andrade told Lemus he had moved up to chequeo, explaining that "he had murdered someone," specifically, "a dark-skinned person." JA1447–1448. Andrade also told Lemus that Arevalo had become a chequeo. JA1448. Separately, Andrade told Guevara that Arevalo had shot Tate, and that Andrade "finished firing" at Tate. JA1017.

**F.     STLS members kill Antonio Smith.**

On September 23, 2019, Canales called Guevara and told him that Aguilera would be "coming down to Virginia from New York" and that they "should go out and get food," meaning, "go look for someone to kill." JA1019–1020. When Aguilera arrived, he, Guevara, and Molina went to some townhouses near Guevara's home. JA1020–1021. After a few thwarted attempts to kill people they saw walking in the street, the group drove to Maryland. JA1021–1023. The trio "went to different areas," but were unsuccessful in their mission and decided to return home. JA1024.

When they were "close to home," they saw a person who "looked similar to [a] person that [they] had earlier thought to kill." JA1024. Aguilera and Guevara "got out of the car" and "crossed the street towards where the person," later identified as Antonio Smith, "was coming towards [them] on foot." JA1024–1025. Guevara said to Smith, "What's up," and Smith responded in kind. JA1025. Guevara told Aguilera, "[W]e're going to kill this one," and Aguilera agreed. JA1025.

13

Guevara started shooting Smith in the back, and Smith "fell down." JA1025. Then, Guevara "started shooting at him again in his chest," and Smith shouted, "oh my God, no, amigo, stop." JA1025. Guevara "continued shooting" Smith, then Aguilera asked for the gun, and Guevara gave it to him. JA1025. Aguilera started shooting Smith, and Guevara returned to the car. JA1025–1026. Aguilera and Molina soon returned to the car, and Guevara drove away. JA1026.

In the car, they "started flashing the gang sign." JA1026. Canales, who "was close to [Guevara's] house" with Arevalo, called to say "that he had heard the shots and was asking whether that was" them. JA1026. Canales warned "that there was a lot of police presence in the area." JA1026. Aguilera, Guevara, and Molina drove to Fredericksburg and stayed in a motel that night. JA1027. All three men were promoted after Smith's murder. JA1029.

### G.    Molina confesses to the double murder, then recants.

In November 2019, police executed a search warrant on Molina's home. JA1656. Officers arrested Molina on state drug and gun charges and interviewed him at length. JA2705.

Initially, Molina denied any involvement in the double murder of Beltran and Mayorga. *See, e.g.*, JA2783, JA2794, JA2804, JA2807, JA2810, JA2816–2817. Eventually, after several hours of questioning, Molina told the officers, "I am the one responsible for everything; just me." JA2939. But Molina provided scant detail.

When officers asked him to describe what happened and how Beltran and Mayorga died, Molina said, "That was at night," JA2942, and "I didn't see them," JA2943. Molina then claimed he "shot them and [] stabbed them," but said he did not remember what kind of gun he used or whom he killed first. JA2944. When asked about his motive, Molina responded, "They tried first." JA2945. Molina claimed that the gun and the knife "disappeared." JA2950. When officers asked where he killed Beltran and Mayorga, Molina responded, "It was right there where you found them." JA2952. Based on this confession, state authorities charged Molina with the murders of Beltran and Mayorga. JA1717–1718.

In January 2020, Prince William County Police Department Detective Michelle McAllister conducted a recorded interview of Molina's mother, Ana Rodriguez ("Rodriguez"). During the interview, Detective McAllister advised Rodriguez that the police had been listening to Molina's jail calls and that Detective McAllister had translations of those calls. JA2706. Detective McAllister told Rodriguez that, according to those translations, "Molina had asked his mother to tell the police that he was with her at her house" on June 22, 2019, the day of the double murder. JA2706–2707.

Rodriguez acknowledged that Molina "had apparently told her to recall that he was at her house that day, but she vehemently and repeatedly denied Detective McAllister's insinuation that he had done so because he wanted her to lie for him."

15

JA2707. Further, Rodriguez told Detective McAllister that she "could not account for" Molina's "whereabouts all day and all night" on June 22, 2019. JA2707. All that Rodriguez knew was that Molina "had swung by her house in Fairfax for 15 or 20 minutes to drop off his son, who had a chest cold, at roughly 10:00 AM and had stopped by to collect him after work at approximately 8:30 or 9:00 PM." JA2707.

In September 2020, Molina told police that he had lied about murdering Beltran and Mayorga, explaining that he had tried to take the blame for the real perpetrators: Arevalo, Guevara, and Turcios. JA2708. Molina admitted that he had actually participated in the murders of Tate and Smith, and he described those murders in detail. JA2708. Molina later told federal agents that he had lied about committing the double murder "out of fear and loyalty to MS-13," and that "he decided to tell investigators the truth" when he started to feel "the gang was not staying loyal to him." JA2708.

## H. Vasquez pleads guilty and is removed from the United States.

After arresting Molina, police conducted several interviews of Vasquez, JA2719, two of which are relevant here.

First, during a December 13, 2019, interview, Vasquez made statements about what Guevara had told Vasquez about several murders. When asked about Guevara's involvement in any murders, Vasquez said he "started to hear . . . [t]hat they had killed two." JA3024. According to Vasquez, Guevara "said they

16

had . . . But he didn't say that he did, but rather that they had gone to kill two, but no, I didn't know who." JA3025. Vasquez said that, several months later, Guevara "started to talk about how they had . . . killed another one." JA3026. Officers asked whether Guevara ever told Vasquez that Guevara or his friends were shot during a murder. JA3041. Vasquez initially said Guevara "never told [him] anything about that," but then changed course, stating, "I don't know if it was the first two, that I think they—they had— . . . pulled out a weapon on one of them, or he wanted to run, I don't know. Or—or if it might have been the second one. I don't remember." JA3041. After further questioning, Vasquez said, "I think it was the black guy because I recently heard about that . . . . About the other one, I think he had said that—that one of them tried to run and the other one was shot." JA3042.

Officers pressed for more information about who was present for the double murder. *See* JA3127. Vasquez stated, "I only know of [Guevara] and [Molina]." JA3128. He added, "I know there were others, but I don't know if there were four or five more. I don't know." JA3129. Officers also asked who was with Guevara "when they killed the black guy," and Vasquez responded, "I don't know about that, but I do know that [Molina] was—[Molina] was with him that day." JA3043. Vasquez added that he thought "there was another one." JA3044. Then Vasquez remarked, "I don't know if [Molina] was there with him that day exactly, but . . . he did go with him that day." JA3044.

17

Vasquez made similar statements during a September 3, 2020, interview. He reiterated that Guevara said "he had been present there when they had killed two in Woodbridge." JA3208. As for "the third one," Guevara "just said that he had done something around near his house, but after that, he didn't . . . say more about it." JA3209. Vasquez did not know whether the latter incident was "a murder, because" Guevara "didn't tell [Vasquez] he had killed anyone." JA3209.

In April 2023, Vasquez pleaded guilty to being an accessory after the fact to the murders of Beltran and Mayorga. JA3474–3477. In July 2023, the district court sentenced Vasquez to time served, JA3489, and he was removed from the United States, JA2709.

## I.      The district court grants the government's motion to limit the cross-examination of Guevara.

In June 2023, a federal grand jury returned a second superseding indictment charging defendants with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) ("Count One"); conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a) and 846 ("Count Two"); VICAR conspiracy to murder Beltran, in violation of 18 U.S.C. § 1959(a)(5) ("Count Three"); VICAR murder of Beltran, in violation of § 1959(a)(1) and 2 ("Count Four"); and use of a firearm during a crime of violence causing the death of Beltran, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1), and 2 ("Count Five"). JA181–209. The grand jury also charged Arevalo with VICAR murder of Mayorga, in violation of § 1959(a)(1) and

18

2 ("Count Six"); use of a firearm during a crime of violence causing the death of Mayorga, in violation of §§ 924(c)(1)(A)(iii), (j)(1), and 2 ("Count Seven"); tampering with a witness by killing him, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and 2 ("Count Eight"); VICAR conspiracy to murder Tate, in violation of § 1959(a)(5) ("Count Nine"); VICAR murder of Tate, in violation of § 1959(a)(1) and 2 ("Count Ten"); use of a firearm during a crime of violence causing the death of Tate, in violation of §§ 924(c)(1)(A)(iii), (j)(1), and 2 ("Count Eleven"); and distribution of cocaine, in violation of §§ 841(a) and 2 ("Count Seventeen"). JA210–215, JA221.

In September 2023, the government moved to preclude defendants from cross-examining Guevara about allegations that ███████████████████ ████████████████████████████ JA2611. Guzman had pleaded guilty and first raised these allegations in filings related to her sentencing. JA322, JA2611. Guzman described how, ███████████████████████ ████████████████████████████████████████ ██████████████████████████████. JA2698–2700. These allegations were disputed: Although Guevara ████████████████████████ ████████████████████████████████████████ ████████████████ JA2611. These allegations were also unsubstantiated: ████████████████████████████████████████

19

████████████████████████████████████████

JA2611 n.1.

The government argued that, even assuming the allegations were true, these acts were not proper grounds for cross-examination under Federal Rule of Evidence 608(b) because they were not probative of Guevara's character for truthfulness nor under Federal Rule of Evidence 404(b) because they were not relevant to defendants' guilt of the charged offenses.  JA2614–2616.  Nor would these acts show Guevara's bias, given that ████████████████████████████████

████████████████████████████  JA2616.  The government added that, even if these acts were admissible, the court should exercise its discretion under Federal Rules of Evidence 403 and 611 to prohibit cross-examination on this topic.  JA2617.

Defendants opposed the motion, arguing that evidence that ████████████

████████████████████████████████████████

████████████████████.  JA2622–2628.

The district court granted the government's motion, ruling that Guevara could "not be questioned about any assaultive conduct as to his girlfriend."  JA284.  The court declined to "have a trial within a trial" and reasoned that Guzman's allegations were "not a proper area of cross-examination."  JA308.  The court denied reconsideration of that ruling.  JA405.

**J.    The district court denies defendants' motion to dismiss the indictment for due-process violations.**

In December 2023, defendants moved to dismiss the indictment on two grounds.

First, defendants alleged that the government violated their due-process rights by allowing Vasquez to be removed from the United States before trial.  JA2644–2648.  In response, the government argued that Vasquez would not have provided material or favorable testimony because Vasquez's interviews contained multiple inconsistencies and demonstrated that he lacked personal knowledge of the charged murders.  JA2718–2728.  Further, to the extent Vasquez would have testified that Guevara told Vasquez that Molina was present for the double murder, that would have been cumulative of other testimony available to defendants at trial: the testimony of Guevara and Molina.  JA2728.  Additionally, there was no evidence that the government acted in bad faith in allowing Vasquez to be removed.  JA2731.

Second, defendants asserted that the government violated their due-process rights by failing to retain recordings of Molina's jail calls while he was incarcerated in the Prince William County Adult Detention Center ("ADC").  JA2648–2652.  The government had advised defense counsel that the ADC's audit trails indicated that Prince William County Detective Thomas Rodriquez had accessed Molina's jail calls on January 27, 2020, but did not download copies of those calls.  JA2675.  "The

ADC's call system has a two-year retention period, and calls made or received more than two years in the past are purged from the system."  JA2675–2676.

The government argued that, even assuming that officers listened to Molina's jail calls, those calls were neither apparently nor potentially exculpatory.  JA2712–JA2713.  Further, there was no evidence that police acted in bad faith in failing to preserve the recordings or any notes of those calls.  JA2713–2716.  The government added that defendants could obtain comparable evidence by cross-examining Molina and Detective McAllister or by subpoenaing Rodriguez or Detective Rodriquez to testify.  JA2716.

The district court denied defendants' motion.  JA409.  Regarding Vasquez, the court commented that the failure to prevent his removal was "unwise" but did not warrant dismissal of the indictment because the court did not "have any evidence" of "any actual bad faith on the government's part."  JA407.  Depending on the evidence at trial, the court would consider giving a missing-witness instruction or allowing Vasquez's statements to come in through other witnesses.  JA407–408.  As for Molina's jail calls, the court ruled that defendants could call Molina's mother to testify and cross-examine Molina himself.  JA408.

### K.     The district court prohibits the government from calling Molina to testify at defendants' trial.

In December 2023, the district court severed defendants for trial.  JA398–399.

Canales, Andrade, and Aguilera would be tried first, and Menjivar, Arevalo, and

Turcios would be tried second.  JA427.

During the first trial, Arevalo moved for specific relief to enforce the Court's

*Brady*[2] order.  Arevalo argued that the government had failed to disclose until

January 16, 2024 an email identifying a woman who had reported in December 2019

that Molina and a man named Hector Naranjo had bragged to her about committing

the double murder.  JA3396–3398.  Guevara later testified that he had used a

Facebook account with the name Hector Naranjo "but nobody knew [him] by that

name."  JA1232.

The district court granted the motion, ordering that Molina was "not permitted

to testify as a witness in the second trial."  JA429.  The court later clarified that its

"order was addressed to the government," and did not restrict defendants from

calling Molina as a witness.  JA565–566.

### L.     A jury finds defendants guilty at trial.

In January 2024, defendants proceeded to a jury trial.

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

23

### 1. The government presents its case-in-chief.

The government called fifteen witnesses, who testified to the events summarized above. The government also introduced records from Beltran's phone, which showed multiple contacts with Arevalo's phone in the weeks before Beltran's murder. JA1723–1728.

The lead case agent, FBI Special Agent Paul Fisher, testified. On cross-examination, Arevalo asked about the December 2019 tip from a woman reporting that Molina and "Hector Naranjo" were bragging to her in a taco restaurant about having committed the double murder. JA1776–1777. Arevalo also asked about the December 20, 2019, interview of Vasquez. JA1784–1785.

### 2. Defendants present evidence.

After the government rested, defendants adduced evidence. The district court allowed Arevalo's counsel to play clips of Vasquez's December 13, 2019, interview for the jury. JA1838. The court commented that Vasquez "should have been kept here," but determined that it was "foolishness," not "bad faith," for the government "not to have kept him here." JA1838. The court acknowledged, however, that Vasquez indicated he "would not cooperate" and "would not testify," so even if he had remained in the United States and been called to testify, it was uncertain whether Vasquez "would have refused to say anything." JA1838.

24

Turcios called three witnesses. Monse Ambriz testified that on the night of June 21, 2019, Turcios asked her to "bring him some food." JA1850. Ambriz "made him some eggs" and took them to Turcios "around probably 11:00." JA1850. She testified that she was with Turcios for about an hour. JA1851.

Thomas Buckley, a private investigator, testified that he visited the Exxon gas station across from La Americana. JA1864. On January 27, 2024, Buckley and another private investigator, Philip Becnel, conducted an experiment to see if it was possible for a person inside the Exxon to hear a conversation occurring at the dumpster behind the gas station. JA1874–1875. Buckley stood inside the store with Turcios's attorney while Becnel stood outside by the dumpster with Arevalo's attorney. JA1875, JA1884. Becnel and Arevalo's counsel sang for about one minute in "a loud singing voice." JA1885. Buckley could not hear anything from inside the store. JA1875. Becnel and Arevalo's counsel then sang for about another minute, this time with Becnel "screaming at the top of [his] lungs." JA1886. Buckley still could not hear them. JA1875–1876. Buckley testified that, based on his experience, he would not have been able to distinguish the voice of a person talking by the dumpster while he was standing inside the store. JA1877.

Next, Arevalo's counsel read the following stipulation into the record:

25

> In December 2019, a tipster with the initials A.R. called the Prince William County Police Department to say that Abner Molina and Hector Naranjo admitted to her at a taco restaurant in Manassas that they had killed Milton Beltran and Jairo Mayorga.
>
> She also attempted to submit a tip via the police department's online tip reporting system but included the information in the subject line which was governed by a character count.

JA1888–1889.

Arevalo called three witnesses, including Detective McAllister. She testified that, after a Spanish-speaking investigator learned from Molina's jail calls that Molina appeared to be asking his mother to provide an alibi, Detective McAllister confronted Molina's mother about that request. JA1906–1907. Detective McAllister acknowledged that, in the recording of the interview, she appeared to be "reading from something to get specific language about what was said on the jail call," but maintained that "there was no transcription," and she had "no notes" to turn over. JA1909. Arevalo played clips of Detective McAllister's interview of Molina's mother for the jury. JA1910.

Arevalo also asked Detective McAllister about the December 13, 2019, interview of Vasquez and played three clips of that interview for the jury. JA1910–1913. After releasing the jury for the evening, the district court commented that the "last clip was a complete waste of time. We've just heard some agent going after this witness, and he says almost nothing." JA1914. The court advised counsel to

"be far more judicious about how much of this interview you're going to play, because it's not appropriate." JA1914.

When Detective McAllister's testimony resumed, she recalled that Vasquez believed that Guevara and Molina were together on the day of Tate's murder, but "was unsure" if Molina had participated in the murder. JA1934. Detective McAllister confirmed, based on an interview clip, that Vasquez had stated that the only people he knew to be present for the double murder were Guevara and Molina. JA1936–1937.

On cross-examination, Detective McAllister told the jury that Vasquez "was not deemed credible at any point by any law enforcement officer." JA1947. She explained that Vasquez "made so many conflicting statements" in his interview, and that was "why the interview took so long to clarify what he was saying." JA1947. Detective McAllister described how, throughout the interview, Vasquez conflated the murders and provided names not recognized by law enforcement. JA1954. Ultimately, police did not rely on the information provided by Vasquez to charge Guevara because Vasquez "was deemed not credible" and "[t]here was nothing substantiated." JA1956.

### 3. The parties deliver closing arguments.

At the close of the evidence, the district court conferred with the parties about the jury instructions. The court declined to give a missing-witness instruction for

Vasquez, noting "how miserable the tape recording is of Mr. Vasquez and the fact that I think you've had more than enough access to his testimony, which I don't think would have helped and could possibly have inculpated folks if it really had been done in a more precise manner."  JA1976.  The court also declined to give an instruction regarding Molina's jail calls, reasoning that "[t]here is absolutely no evidence before this [c]ourt that the government destroyed the jailhouse tapes." JA1977.

Finally, the parties delivered their closing arguments.  Counsel for the government spoke first.  Next, Arevalo's counsel presented argument.  Counsel argued that it was Guevara and Molina, not Arevalo, who killed Beltran and Mayorga.  JA2026.  Counsel cited Molina's retracted confession, the jail call in which Molina asked his mother to provide him an alibi for the day of the double murder, and the report that Molina and "Hector Naranjo," also known as Guevara, bragged to the tipster about committing the double murder.  JA2026–2027.  Arevalo added that the jury "got to hear [Vasquez] in his own voice explaining that [Guevara] told him he committed these murders with [Molina]."  JA2029.  Arevalo further argued that Guevara's story about how Arevalo found Beltran outside the gas station made "no sense," and that defense counsel's experiment confirmed that it was not possible to hear someone standing beside the dumpster from inside the store. JA2034–2035.

28

Menjivar's counsel delivered his argument next. Counsel argued that Menjivar did not participate in the double murder and was not involved in planning it. JA2049. Counsel added that Menjivar "was focused on the drug business," JA2051, and it was Canales who believed STLS "should have been killing people," JA2050.

Turcios's counsel went last. Counsel noted that Turcios "didn't take the stand" and that the jury "might wonder, like, why didn't he tell his story?" JA2063. Counsel argued that Turcios "has a grade-school education in El Salvador" and "doesn't speak the language," so he decided to let counsel "tell his story." JA2063–2064.

Next, counsel "suggest[ed]" to the jury that two of the government's cooperating witnesses "told you the truth." JA2064. First, regarding Figueroa, counsel stated, "Her tears on cross-examination, that was real pain to me." JA2064. Counsel recounted that Figueroa "overheard [Guevara] tell [her husband] how he had just committed the double murder with [Arevalo]." JA2064. Counsel argued, "I suggest to you that she probably was telling the truth, and she probably got it right." JA2065. Second, regarding Lemus, counsel stated, "He had real regret to me." JA2065. Counsel observed, "So I think these two are telling the truth." JA2065. Counsel argued that Guevara, however, was "a different story" and that he was "what a sociopath looks like." JA2065.

29

Turcios's counsel then addressed Guevara's testimony that Arevalo heard Beltran's voice behind the gas station. Counsel argued, "Okay. We know that that didn't happen." JA2068. Instead, counsel offered an alternate version of events:

> Here's what I suggest happened. [Guevara] was driving around that night with someone else, maybe [Molina]. There's a lot of evidence of that. It's a Friday night, they're out at the clubs, they're selling cocaine, they're doing cocaine, something [Turcios] wasn't involved with; right? They stop at the Seven Mart, not at the Exxon, at the Seven Mart.

JA2068.

Turcios's counsel continued, "I suggest to you that they're driving around out randomly" because, "[i]f they really wanted to get [Beltran] this night, [Guevara] said he knew where his house was, he would have been waiting outside." JA2069. Instead, counsel argued, "They went there, they heard [Beltran]'s voice," "they saw [Beltran], and [Guevara] and whoever was with him lured him with drugs into the woods, shot and killed him and stabbed [Mayorga]." JA2069. Referencing Ambriz's testimony that she was with Turcios "from 11 p.m. to 12 a.m. that night," counsel argued that "perhaps [Turcios] then walked to the Exxon—that's why the Exxon is in the story—and they picked him up after." JA2069.

The government attempted to object, but the district court instructed, "Don't object." JA2074. In closing, counsel told the jury, "Please remember Karen Figueroa, and please take care of [Turcios]." JA2077.

30

**4. The district court denies defendants' motions for severance and a mistrial.**

After the government delivered its rebuttal argument, Arevalo's counsel moved for severance and a mistrial. JA2093. The district court "agree[d] that [the] closing argument went way beyond the bounds of appropriate conduct." JA2095.

After a recess, the district court denied the motions for severance and a mistrial, advising that it would give the jury a curative instruction instead. JA2100. When the trial resumed, the court gave the jury its final instructions. Regarding Turcios's closing argument, the court instructed:

> Now, during closing argument, the defendant, Carlos Jose Turcios Villatoro, that is Oculto, Ms. Van Pelt made improper and inappropriate statements regarding the credibility of witnesses in this case. Her closing argument improperly relied on her personal perception of witnesses' credibility, which is called vouching, and is not permitted, and her argument did not focus solely on the evidence presented during trial. I am, therefore, instructing you to completely disregard the entire closing argument offered by Ms. Van Pelt on behalf of her client, Mr. Turcios Villatoro.
>
> You may not use any of the information or arguments she offered as you deliberate in this case; however, nothing in this instruction changes the requirement that you cannot find Mr. Turcios Villatoro guilty of any offense unless the government has proven his guilt for that offense beyond a reasonable doubt.

JA2111–2112.

After deliberating, the jury found Arevalo guilty of Count One and further found that, as part of the offense, Arevalo killed Beltran, Mayorga, and Tate. JA2232–2233. The jury acquitted Arevalo of Counts Nine, Ten, and Eleven and

31

found him guilty of all other charged counts. JA2233–2235. As for Menjivar, the jury found him guilty of all charged counts and found that, as part of the offense charged in Count One, Menjivar aided and abetted the murder of Beltran. JA2236–2237.

### M. The district court denies defendants' post-trial motions and sentences defendants to life imprisonment.

After trial, Arevalo moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal. Arevalo argued that the court should set aside the jury's special finding that, as part of Count One, he killed Tate, because the special finding was inconsistent with the jury's acquittals on Counts Nine, Ten, and Eleven. JA2257–2263. The government opposed the motion, arguing that any inconsistency did not warrant a judgment of acquittal or new trial, and that the special finding and the acquittals were not necessarily inconsistent. JA2336–2342.

Arevalo also moved for a new trial, arguing that Turcios's closing argument deprived Arevalo of a fair trial and that the court's curative instruction was insufficient to remedy the prejudice he suffered. JA2288–2299. Menjivar likewise moved for a new trial based on Turcios's closing argument. JA2322. The government opposed the motions, agreeing that Turcios's closing argument was improper, but maintaining that the court's curative instruction sufficiently remedied any prejudice. JA2360–2372.

32

After a hearing, the district court denied defendants' motions. Regarding the special finding on Count One, the court declined "Arevalo's invitation to parse through the possibilities that the jury considered in rendering its verdict." JA2498. Additionally, the court agreed with the government that "the jury's determinations as to special finding three and the separate substantive counts" were "not wholly irreconcilable or impossible." JA2499.

The court also denied defendants' motions for a new trial. The court determined that "the closing argument by Turcios's counsel was improper, for among other things, improperly vouching for a witness and alluding to facts not in evidence." JA2503. Nonetheless, the court reasoned that "the jury instructions adequately addressed any prejudicial effect the closing argument had on the jury's consideration of the evidence against Arevalo and Menjivar." JA2503–2504. Further, the court concluded that "[t]he overwhelming evidence introduced at trial— coupled with the comprehensiveness of the [c]ourt's instructions to the jury— support[ed] the verdicts returned by the jury and the interests of justice [did] not require a new trial." JA2504.

In June 2024, the district court sentenced Menjivar and Arevalo to life in prison. JA2543; JA2550. Defendants timely noted their appeals. JA2555; JA2557.

33

## Summary of Argument

1.     The district court did not abuse its discretion in preventing defendants from cross-examining Guevara about Guzman's allegations.  Because the court permitted counsel to probe Guevara's motives for testifying in multiple other ways, this proposed line of questioning is unlikely to have affected the jury's impression of Guevara's credibility.  Guzman's disputed allegations were not otherwise proper grounds for cross-examination.  Further, the danger of unfair prejudice, confusing the issues, and wasting time substantially outweighed any probative value of this evidence.  Regardless, any error was harmless because the government's case was overwhelming, and the court otherwise permitted extensive cross-examination of Guevara.

2.     The district court properly denied defendants' motion to dismiss the indictment for due-process violations.  First, the pretrial removal of Vasquez from the United States did not violate due process because Vasquez was unlikely to testify at trial and, even if he did, his testimony would not have been favorable or material in ways not merely cumulative to the testimony the jury already heard.  Dismissal was unwarranted because the court correctly found that the government did not act in bad faith in allowing Vasquez to be removed.  Second, the failure to preserve Molina's jail calls did not violate due process because the calls had no apparent exculpatory value before they were automatically purged from the detention center's

34

system, and defendants could obtain comparable evidence through available witnesses.  Here, too, the district court correctly found that the government did not act in bad faith.  Third, the late disclosure of the name and contact information of the December 2019 tipster did not violate *Brady* because the government disclosed this information before this trial, and defendants made effective use of this material at trial, including by providing the jury a stipulation.  Moreover, the preferred remedy for an untimely disclosure is a continuance, not dismissal, and defendants have not shown that excluding Molina's testimony was insufficient to remedy the late disclosure.

3.     The district court properly denied defendants' motion for a mistrial or a new trial based on Turcios's closing argument.  Although the summation was improper, counsel's remarks did not so prejudice defendants' rights as to deny them a fair trial.  As the district court determined, the evidence against defendants, including cooperator and law-enforcement testimony, phone records, and contemporaneous WhatsApp messages, was "overwhelming."     JA2504.  Meanwhile, the court delivered a strong curative instruction, admonishing the jury "to completely disregard the entire closing argument offered by" Turcios's counsel.  JA2111.  The district court, having witnessed Turcios's summation, the jury's reaction, and the jury's understanding of its instructions, did not abuse its discretion

in concluding that the instructions sufficiently remedied any prejudice to defendants and that a new trial was not warranted.

4.    The district court properly declined to set aside the jury's special finding that, as part of the racketeering conspiracy in Count One, Arevalo aided and abetted Tate's murder.  The special finding was not inconsistent with the acquittals on Counts Nine, Ten, and Eleven because the jury could have found that Arevalo aided and abetted Tate's murder, but that he lacked the requisite purpose to maintain or increase his position in the racketeering enterprise.  Even if the verdicts were inconsistent, that alone does not undermine the validity of the special finding.

## Argument

## I.    The district court did not abuse its discretion in limiting the scope of defendants' cross-examination of Guevara.

Defendants first assert that the district court erred when it prevented them from cross-examining Guevara about Guzman's allegations that ██████████ ████████████████████████████████████████.  Because Guzman's allegations were not proper grounds for cross-examination, and the prejudicial effect of these allegations substantially outweighed any probative value, the district court did not abuse its discretion in foreclosing this line of questioning.  And even if the court erred, any error was harmless.

Defendants invoke their Sixth Amendment right "to be confronted with the witnesses against" them.  U.S. Const. amend. VI.  The "primary interest secured by"

36

the right of confrontation "is the right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315 (1974).[3]   "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).

The Confrontation Clause does not "prevent[] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Id.* at 679.  Instead, "trial judges retain wide latitude" "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.*  Thus, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.*

Additionally, "the Confrontation Clause does not trump established rules of evidence." *Quinn v. Haynes*, 234 F.3d 837, 847 (4th Cir. 2000).   On cross-examination, the district court may permit a party to inquire about specific

---

[3] The government has omitted internal quotation marks, alterations, and citations throughout this brief, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

instances of a witness's conduct "if they are probative of the character for truthfulness or untruthfulness of" the witness. Fed. R. Evid. 608(b). But "extrinsic evidence," other than "a criminal conviction," "is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." *Id.* "The purpose of this rule is to prohibit things from getting too far afield—to prevent the proverbial trial within a trial." *United States v. Bynum*, 3 F.3d 769, 772 (4th Cir. 1993). Similarly, while "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character," such evidence "may be admissible" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). In all cases, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

This Court "review[s] restrictions on cross-examination for abuse of discretion." *United States v. Ayala*, 601 F.3d 256, 273 (4th Cir. 2010). Reversal is not required if any error was harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684.

### A.    Guzman's disputed allegations were not proper grounds for cross-examining Guevara.

The district court did not abuse its discretion in determining that Guzman's allegations were "not a proper area of cross-examination." JA308. Defendants assert four reasons why the court should have permitted this line of questioning, none of which has merit.

First, defendants claim that the restriction violated their right to probe Guevara's bias. To establish a Confrontation Clause violation, defendants must show that "[a] reasonable jury might have received a significantly different impression of [Guevara's] credibility had [defense] counsel been permitted to pursue [this] proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680. Defendants cannot make that showing here because defense counsel clearly conveyed that Guevara stood to gain multiple benefits in exchange for his testimony.

On direct examination, Guevara told the jury he had pleaded guilty to racketeering conspiracy, three counts of VICAR murder, and tampering with a witness by killing him, and he had been sentenced to life in prison on each count. JA830–831. Guevara acknowledged that he only decided to renounce his membership in STLS after he was arrested. JA832. He hoped to have his sentence reduced in exchange for his cooperation. JA832. Guevara admitted that he had entered the United States illegally and never obtained legal immigration status, so

he hoped to avoid removal from the United States in exchange for his cooperation. JA833–834.

On cross-examination, Guevara acknowledged that, when state authorities arrested him, they charged him with 35 felonies. JA1066. Guevara declined to speak with police upon his arrest, JA1069–1070, and did not meet with them again until about two years later, JA1074. He acknowledged that, when he decided to meet with federal prosecutors in September 2022, he did not have a plea agreement and hoped the government would offer him a plea deal based on the information he provided. JA1077–1078. Guevara confirmed that only the government could move the court to reduce his sentence, and the government would do so only if he provided substantial assistance. JA1083–1085.

Further, Guevara admitted that he had committed multiple other crimes for which he had not been charged, including his plans to kill four different people and his attempts to kill two other people. JA1097–1099. The jury also heard that, after he helped police locate a member of STLS known as Grey Boy, Guevara started a sexual relationship with Grey Boy's girlfriend. JA1114–1115. Defense counsel then played for the jury a video in which Guevara and Canales beat Grey Boy's girlfriend with a bat to punish her for having had a relationship with Guevara. JA1116. Counsel also played a video showing Guevara beating Lemus with a bat, as well as a video showing Guevara striking a person known as Vampiro. JA1126–

1128.  Further, counsel played a video in which Guevara rapped about carrying "nines and AK-47s" and bragged about "cutting people's throats."  JA1142.

Thus, defendants thoroughly explored Guevara's motives for testifying for the government, including earning possible sentencing and immigration benefits, avoiding additional offenses that had been charged, and avoiding charges for additional violent crimes he had committed.  Restricting defendants from asking Guevara specifically about his alleged ███████████████████████ did not infringe on defendants' ability to show his potential bias.  *See, e.g.*, *United States v. Purkey*, 428 F.3d 738, 753–54 (8th Cir. 2005) (no abuse of discretion in restricting defendant from cross-examining cooperating witness about uncharged prison misconduct where defense counsel "conclusively demonstrated by other means that [the witness] was driven to testify by a desire for leniency").

Defendants insist Guzman's allegations would have shown that Guevara had an additional incentive to testify favorably for the government to avoid being prosecuted for ███████████████.  But Guevara disputed Guzman's allegations, and defense counsel would not have been able to introduce evidence to prove ███████ if Guevara denied them.  *See* Fed. R. Evid. 608(b); *Bynum*, 3 F.3d at 772.  Further, Guzman ████████████████████ ███████████████████████████████████████.

JA2611 n.1.  It was well within the district court's discretion not to allow questioning

about unsubstantiated allegations.  *See, e.g.*, *United States v. McCarty*, 82 F.3d 943, 949–50 (10th Cir. 1996) (no abuse of discretion in restricting defendant from cross-examining probation officer about "unsubstantiated allegations" that she told the defendant he would receive more favorable treatment "if he engaged in sexual intercourse with her").

Because Guzman's allegations were unsubstantiated, it was uncertain whether they could actually support any charges against Guevara.  *See, e.g.*, *United States v. Hill*, 322 F.3d 301, 305 (4th Cir. 2003) (no abuse of discretion in excluding evidence that fraud victim made a $10,000 gift to another man and then "recharacterized the gift as a loan," because there was a "serious dispute as to the meaning" of the previous transaction); *United States v. Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978) (per curiam) (no abuse of discretion in prohibiting questioning about cooperating witness's prior acts of sodomy on children where the acts were "unrelated in any way to narcotics prosecutions" and "there were no pending or anticipated charges against the witness for which he would even need to curry favor").  Further, the federal government had not immunized Guevara from prosecution for ███████ ████████████████████.  Thus, it would have been speculative to ask the jury to infer that Guevara would avoid state prosecution for these alleged offenses by testifying.

Second, defendants assert that "Guzman's allegations were relevant to Guevara's tendency to downplay his own criminal behavior." Def. Br. 32. Defendants cite no rule or case law authorizing the introduction of these allegations for this purpose. To the extent defendants intended to argue that Guevara minimized his culpability for the murders charged here just as he minimized his culpability for the alleged ███████████, that would be improper. *See* Fed. R. Evid. 404(b)(1). Regardless, Guevara's trial testimony belied that argument. Guevara testified in vivid detail about his participation in the double murder, including how he asked Turcios for the gun and shot at Beltran, fired at Mayorga when he started running, and then shot Beltran again. JA961. Guevara also freely admitted that he provided Arevalo the gun used to kill Tate. JA1007–1012. Further, Guevara detailed the murder of Smith, including how Guevara initiated the encounter and told Aguilera they were "going to kill this one," then "raised the weapon and started shooting" Smith, first in the back, then in the chest, as Smith shouted, "oh my God, no, amigo, stop." JA1025.

Third, defendants claim that Guzman's allegations were relevant to show that Guevara had "a sexual gratification motive for the double homicide," and therefore "did not require Menjivar's direction or Arevalo's assistance." Def. Br. 33. Specifically, to establish defendants' guilt of the VICAR offenses, the government had to prove that defendants' "general purpose" in committing the charged crimes

43

of violence "was to maintain or increase [their] position in the [racketeering] enterprise." *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)). But the question before the jury was whether Arevalo and Menjivar, not Guevara, acted with the requisite purpose. Further, the VICAR purpose element does not require "the government to prove that maintaining or increasing position in the RICO enterprise was the defendant's *sole or principal* motive." *Concepcion*, 983 F.2d at 381 (emphasis added). Even assuming Guevara had an additional, sexual-gratification motive for committing the murders, the purpose requirement is "satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Fiel*, 35 F.3d at 1004 (quoting *Concepcion*, 983 F.2d at 381).

Fourth, defendants claim that "Guzman's allegations were directly relevant to Guevara's participation in MS-13" because Guzman was Guevara's subordinate in the gang. Def. Br. 33. But Guzman alleged that ███████████████████████ ███████████████████████████████████████████ JA2698. None of her allegations had anything to do with her role with STLS. *See generally* JA2698–2700. Regardless, defense counsel successfully cross-examined Guevara about his violent conduct toward his subordinates in the gang. *See, e.g.*, JA1125 (Guevara admitting

that he supervised "a lot of people in the gang" and "participated in most of the clique's corrections"); JA1126–1127 (playing video of Guevara and others "correcting" Lemus with a bat); JA1127–1128 (playing video of Guevara striking Vampiro).

Thus, the district court imposed reasonable limits on cross-examination when it prevented defendants from questioning Guevara about Guzman's allegations. *See, e.g.*, *United States v. Tindle*, 808 F.2d 319, 328 (4th Cir. 1986) (no abuse of discretion in restricting "defense counsel to questions about the *actual* charges lodged against" the cooperating witness "and to items specifically mentioned in the government's plea letter" because "[t]he jury already heard ample evidence about a life laced with crime, deceit, and drug use").

### B. The district court appropriately exercised its discretion to exclude the evidence under Rule 403.

Even if Guzman's allegations were probative of Guevara's credibility, the district court did not abuse its discretion because the danger of "unfair prejudice," "confusing the issues," "wasting time," and "needlessly presenting cumulative evidence" substantially outweighed any probative value of this evidence. *See* Fed. R. Evid. 403.

Guzman's allegations presented a significant risk of unfair prejudice. "Some types of extrinsic acts are particularly likely to incite a jury to an irrational decision . . . ; few would doubt that violent [domestic] abuse falls into this category."

45

*United States v. Hands*, 184 F.3d 1322, 1328 (11th Cir. 1999).  Guzman's allegations

that Guevara ████████ bore no similarity to the drug and murder offenses with which

defendants were charged.  *Cf. United States v. Queen*, 132 F.3d 991, 996 (4th Cir.

1997) (explaining that the similarity of the extrinsic act and the act involved in the

charged offense "provides a cognizable divide" between evidence admissible "to

show a particular intent" and improper propensity evidence).  Allowing defendants

to question Guevara about Guzman's allegations would have invited the jury to

"subordinate reason to emotion in the factfinding process."  *Id.* at 997; *see, e.g.*,

*United States v. Colombo*, 869 F.2d 149, 150, 153 (2d Cir. 1989) (holding, where

the government alleged that the defendant tipped off organized crime members about

possible "scores," that evidence that the robbers raped and sodomized a robbery

victim had only "slight relevance" and was "substantially outweighed by the danger

of unfair prejudice").

Guzman's allegations implicated other risks under Rule 403.  Asking Guevara

about ████████████████ would have wasted the jury's time because

████████████████████████████████████████████████████████

████████████████.  JA2611 & n.1.  Further, Guevara and Guzman's romantic

relationship had nothing to do with the charges against defendants, so asking

Guevara about these allegations would have confused the issues the jury had to

decide.  *See, e.g.*, *Hill*, 322 F.3d at 306 (no abuse of discretion in preventing

46

defendant from cross-examining fraud victim about another transaction where there was "no concrete evidence as to what happened with the" transaction, and admitting "these documents would have necessitated an exhaustive case within a case that would have confused the jury as to the issues to be decided").

To the extent defendants wished to show that Guevara was prone to violence, inquiring about Guzman's allegations would have been needlessly cumulative given that Guevara detailed his merciless shootings of Beltran, Mayorga, and Smith; admitted that he had plotted to kill at least four different people and went hunting for two others; and identified himself in videos that showed him beating Grey Boy's girlfriend, Lemus, and Vampiro. *See supra* p. 40; *cf. United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 324 (4th Cir. 1982) (no abuse of discretion in excluding defendants' proffered expert testimony because it "amounted to unnecessary, cumulative evidence and might well have confused or misled the jury").

### C.    Any error was harmless.

Even if the district court improperly restricted the cross-examination of Guevara, any error was harmless beyond a reasonable doubt.  In this context, harmlessness "depends upon a host of factors," including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of

the witness on material points, the extent of cross-examination otherwise permitted," and "the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

Applying these factors here confirms that any error was harmless. Although Guevara's testimony was certainly important, ample evidence from other sources, including the testimony of Lemus, Figueroa, Detective McAllister, and Special Agent Fisher, as well as contemporaneous phone records and WhatsApp messages, corroborated his testimony. Moreover, the district court otherwise permitted defendants to cross-examine Guevara extensively on a range of topics, including his motive to cooperate with the government for sentencing and immigration benefits, JA1083–1085; JA1102–1103, JA1109; his culpability for additional, uncharged crimes, including plans to kill four different people and attempts to kill two others, JA1098–1099; and his questionable morals, including starting a sexual relationship with Grey Boy's girlfriend after turning Grey Boy over to the police, JA1114–1115, and bringing Guzman's daughter to drug deals, JA1248–1249. The court also permitted defendants to confront Guevara with videos of him assaulting Grey Boy's girlfriend, Lemus, and Vampiro, JA1115–1116, JA1126–1128, and with a video of Guevara rapping a song in which he bragged about carrying "nines and AK-47s" and "cutting people's throats," JA1142. In total, defendants' cross-examination of Guevara spanned multiple hours over three days of trial. *See* JA1049–1086, JA1096–1186, JA1229–1314, JA1363–1372.

48

On this record, there is no reasonable possibility that preventing defendants from cross-examining Guevara about Guzman's disputed allegations contributed to the guilty verdicts. *See, e.g.*, *United States v. Kelly*, 510 F.3d 433, 439 (4th Cir. 2007) (any error in excluding government witness's prior conviction "was harmless, as the defense thoroughly attacked [the witness's] credibility on a variety of other grounds"); *United States v. Capers*, 61 F.3d 1100, 1104 (4th Cir. 1995) (any error in preventing defendants from using DEA manual to cross-examine informants was harmless where defendants "had the opportunity to put before the jury the informants' misbehavior" through cross-examination and "had the opportunity to impeach the informants on other grounds"); *Tindle*, 808 F.2d at 328 (any error in restricting cross-examination of government witness was harmless where "a reasonable juror, having heard all of [the witness's] testimony on cross-examination, inevitably viewed [his] direct testimony with some skepticism").

## II.     The district court did not err in denying defendants' motion to dismiss the indictment for due-process violations.

Next, defendants claim that the district court should have dismissed the indictment based on three asserted due-process violations: (1) the pretrial removal of Vasquez from the United States; (2) the failure to preserve recordings of Molina's jail calls and any related notes; and (3) the late disclosure of the name and contact information of the tipster who reported in December 2019 that Molina and a man named Hector Naranjo had bragged to her about committing the double murder.

49

This Court "review[s] a district court's legal conclusions with respect to a motion to dismiss the indictment de novo, and its factual findings for clear error." *United States v. Kaixiang Zhu*, 854 F.3d 247, 253 (4th Cir. 2017) (per curiam). Because none of defendants' claims established a due-process violation, the district court properly declined to dismiss the indictment.

### A.    Vasquez's removal from the United States did not violate due process.

Defendants' challenge to the pretrial removal of Vasquez implicates two related rights. The Sixth Amendment guarantees a criminal defendant the right to "compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The Due Process Clause of the Fifth Amendment further "guarantees that a criminal defendant will be treated with that fundamental fairness essential to the very concept of justice." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982). Courts balance these rights against "the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress," which "justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant." *Id.*

The removal of an illegal-alien witness from the United States, by itself, "is not sufficient to establish a violation of" due process. *Id.* at 873. Instead, the defendant must "make[] a plausible showing that the testimony of the deported witness[] would have been material and favorable to his defense, in ways not merely

cumulative to the testimony of available witnesses." *Id.* Dismissal is warranted "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 874. Additionally, "[a] majority of the Circuits read *Valenzuela-Bernal* as establishing a second requirement as well—that the government acted in bad faith." *Kaixiang Zhu*, 854 F.3d at 255 (collecting cases). For at least three reasons, defendants have not shown that the pretrial removal of Vasquez from the United States violated their due-process rights.

First, defendants have not shown that, if he remained in the United States, Vasquez would have testified at trial. *Cf. United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004) (observing that "circumstances indicating that a potential witness will refuse to testify may support a decision not to compel disclosures sought by the defense"). Vasquez agreed to plead guilty to being an accessory after the fact to the murders of Beltran and Mayorga, JA3477, but did not agree to cooperate with the government, JA3439. The government conferred limited immunity on Vasquez. *See* JA3466–3467. Thus, even if Vasquez had remained in the United States, he could have invoked his privilege against self-incrimination and refused to testify at trial. *See United States v. Abbas*, 74 F.3d 506, 511 (4th Cir. 1996) ("Where the right to compulsory process and self-incrimination are in conflict, the privilege against self-incrimination prevails."). For this reason, the district court correctly recognized that Vasquez "said he would not cooperate" and "would not testify," so "had he been

kept here, we don't know whether, if [defendants] called him, he would have refused to say anything." JA1838.

Second, defendants have not shown that, if he were available, Vasquez would have provided testimony that was material and favorable to the defense, in ways not merely cumulative to the testimony of available witnesses. Generally, evidence is favorable to a criminal defendant if it is exculpatory or impeaching. *E.g.*, *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "Evidence is material only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Kaixiang Zhu*, 854 F.3d at 256. The Court assesses materiality "in the context of the entire record." *Id.*

Recall that Vasquez's anticipated testimony suffered from multiple defects. Vasquez lacked personal knowledge of the charged murders because he was not a member of MS-13 and was not present for any of the murders. JA1945. The only information Vasquez provided was based on what Guevara had told him. JA1945, JA1959. Vasquez's statements contained multiple inconsistencies, conflated the murders, and referred to names never identified by law enforcement. *See* JA1950–1954. Ultimately, Vasquez "was not deemed credible at any point by any law enforcement officer," JA1947, and none of his statements was "substantiated," JA1956. After listening to the clips of Vasquez's interview played at trial, the district court declined to give a missing-witness instruction, reasoning that

52

defendants "had more than enough access to his testimony, which I don't think would have helped and could possibly have inculpated folks if it really had been done in a more precise manner." JA1976.

To show that Vasquez's testimony nonetheless would have been favorable, defendants focus on the portion of Vasquez's December 13, 2019, interview where he indicated that Guevara said that Molina was present for the double murder. *See* JA3127–3128.[4] But Vasquez then added, "I know there were others, but I don't know if there were four or five more." JA3129. Vasquez could not identify any of the others who were present, explaining that Guevara "really didn't tell me anything about that." JA3129. To be sure, Vasquez rejected the interrogating officer's suggestion that Menjivar was present for the double murder. *See* JA3127–2128. But Vasquez's statement was not exculpatory as to Menjivar because the government always maintained that Menjivar authorized Beltran's murder, not that he was present for it. *See, e.g.*, JA194 (second superseding indictment); JA2007–2011 (closing argument). Meanwhile, Vasquez said nothing about Arevalo, presumably because Vasquez did not know who Arevalo was. *See* JA3181 (Vasquez indicating he did not recognize the name "Serio"). Thus, Vasquez's account was not exculpatory as to Arevalo, since it left open the possibility that Arevalo was one of

---

[4] In at least two other interviews, Vasquez did not mention Guevara reporting that Molina was present for the double murder. *See* JA2722 n.12.

the "four or five" others who were also present for the double murder. *Cf. United States v. Leisure*, 844 F.2d 1347, 1361 (8th Cir. 1988) (statement of codefendant's brother that he and another man were responsible for a car bombing "was not sufficiently exculpatory to warrant a new trial" because the "statement was silent" about "whether any of the appellants also participated in the car bombing").

Even if this testimony would have been favorable to defendants, it was not material. At trial, defendants thoroughly aired their alternate theory that Guevara committed the double murder with Molina, not with Arevalo and Turcios. Defendants cross-examined Special Agent Fisher about Molina's November 2019 confession claiming sole responsibility for the double murder. JA1773–1775, JA1812–1813. Defendants also called Detective McAllister, who acknowledged that she had confronted Molina's mother about a jail call in which Molina apparently asked her to provide him an alibi for the day of the double murder. JA1906–1907. Arevalo's counsel read into the record a stipulation that in December 2019, a tipster reported that "Abner Molina and Hector Naranjo admitted to her at a taco restaurant in Manassas that they had killed Milton Beltran and Jairo Mayorga." JA1888. Further, counsel played clips of Vasquez's December 13, 2019, interview for the jury and elicited confirmation from Detective McAllister that Vasquez had stated that the only people he knew to be present for the double murder were Guevara and Molina. JA1936–1937. Based on this evidence, Arevalo argued in closing that

Guevara and Molina, not Arevalo, committed the double murder. *See* JA2026–2029. Counsel emphasized that the jury "got to hear [Vasquez] in his own voice explaining that [Guevara] told him he committed these murders with [Molina], explaining that [Molina] also told him that he was there." JA2029. Thus, the jury heard multiple pieces of evidence, in addition to the recordings of Vasquez's interview, implicating Molina in the double murder, but nonetheless found defendants guilty.

Defendants also claim Vasquez's testimony would have been favorable because it would have impeached Guevara's testimony in two respects.[5] First, defendants sought to impeach Guevara's testimony that Molina was not present for the double murder. But defense counsel specifically questioned Guevara on this topic, and Guevara denied having told Vasquez that Molina was present for the double murder. JA1149–1150. In fact, Guevara did not "remember having talked to [Vasquez] about [Molina]" whatsoever. JA1150. Further, defense counsel successfully elicited testimony from Detective McAllister, who participated in the interview of Vasquez, that Vasquez had said Guevara told him Molina was present for the double murder. *See* JA1936–1937. Defense counsel also played numerous clips from the recording of Vasquez's interview for the jury. Thus, the testimony

---

[5] Defendants also suggest that Vasquez's testimony would have been favorable because it would have impeached Molina's testimony. *See, e.g.*, Def. Br. 42, 44. But Molina did not testify at this trial. *See* JA429.

defendants sought from Vasquez was not material because it was cumulative of what the jury already heard. *See Kaixiang Zhu*, 854 F.3d at 256 (concluding that, because "other witnesses could have provided the same testimony," the anticipated testimony of an alien witness who had been removed "was cumulative and therefore not material").

Defendants also assert they would have impeached Guevara's testimony that he did not participate in Tate's murder, claiming that Vasquez's statements placed Guevara at the scene of Tate's murder. But Vasquez repeatedly denied that Guevara told him about a murder in which the decedent shot back. JA1946; *see* JA3040–3041. And when Vasquez did start talking about such a murder, "[i]t was very unclear" which murder he was talking about. JA1947; *see* JA3041–3043. Although defendants insist that Vasquez was discussing the Tate murder, Vasquez appeared to be referring to the Smith murder, which occurred in September 2019 near Guevara's house. *See* JA1950–1952; JA3026–3029. Regardless, counsel played the recording of this portion of Vasquez's interview for the jury, and Detective McAllister confirmed that Vasquez said that Guevara and Molina were together on the day of Tate's murder. JA1933–1935. Having Vasquez testify to these statements is unlikely to have affected the jury's verdict.

Third, the government did not act in bad faith by permitting Vasquez to be removed from the United States. Although this Court has not reached this question,

"[a] majority of the Circuits read *Valenzuela-Bernal*" as requiring the defendant to show "that the government acted in bad faith in deporting a key witness, in a conscious effort to gain a tactical advantage by suppressing exculpatory evidence." *Kaixiang Zhu*, 854 F.3d at 255 (citing *United States v. Leal-Del Carmen*, 697 F.3d 964, 970 (9th Cir. 2012); *United States v. Damra*, 621 F.3d 474, 489–90 (6th Cir. 2010); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000); *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997)); *see also Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) (characterizing *Valenzuela-Bernal* as a decision considering the "good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government"). "[F]or purposes of the Due Process Clause," bad faith "turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*.

In this case, the government provided recordings and summaries of Vasquez's interviews to all defense counsel in November 2022, but no defendant attempted to interview or subpoena Vasquez before he was removed in July 2023. JA2731. The government also made Vasquez's criminal history, removal order, and immigration status available for defendants' review before Vasquez's plea and sentencing hearings, JA3501–3502, thus putting counsel on notice that Vasquez was subject to removal. At Vasquez's sentencing, the government made clear that it did not plan

to call Vasquez as a witness at trial and that he would be removed from the United States upon service of his sentence.  JA3488–3489.  The government requested a sentence of 70 months, JA3486, evincing no rush to have Vasquez removed, but the court imposed a sentence of time served, JA3490, triggering his removal.  On these facts, the district court correctly concluded that there was no "evidence" of "any actual bad faith on the government's part."  JA407; *see also* JA1838 (finding it was "foolishness," not "bad faith," for the government "not to have kept him here").  For this additional reason, the district court properly denied defendants' motion to dismiss.  *See, e.g.*, *United States v. Dring*, 930 F.2d 687, 695 (9th Cir. 1991) (affirming denial of motion to dismiss where defendant "presented no evidence that the Government departed from normal deportation procedures" or "deported the aliens to gain an unfair tactical advantage over him at trial").

## B.    The failure to preserve Molina's jail calls did not violate due process.

Next, defendants argue that the failure to preserve Molina's jail calls or any related notes "exacerbated" the pretrial removal of Vasquez from the United States. Def. Br. 55.  The "failure to preserve evidence[] can be a due-process violation" if the defendant "show[s] that the unpreserved evidence had 'an exculpatory value that was apparent before the evidence was destroyed[] and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *United States v. Perry*, 92 F.4th 500, 513 (4th Cir. 2024) (quoting

58

*California v. Trombetta*, 467 U.S. 479, 489 (1984)). The failure to preserve evidence "does not constitute a denial of due process" unless the defendant "can show bad faith on the part of the police." *Youngblood*, 488 U.S. at 58. Bad faith exists "where the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant yet still failed to preserve it." *Perry*, 92 F.4th at 513. Defendants cannot satisfy any of the requirements for establishing a due-process violation here.

The recordings of Molina's jail calls, and any notes on the same, did not have any apparent exculpatory value before the evidence was destroyed. Defendants focus on the evidence that, while he was detained at the Prince William County ADC, Molina had called his mother and asked her "to tell the police that he was with her at her house" on June 22, 2019. JA2706. If Molina was not involved in the double murder, as he later told police, then his request to his mother did not specifically exculpate defendants. *Cf. Youngblood*, 488 U.S. at 56 n.* (defendant failed to show that police knew that "semen samples would have exculpated him" when they failed to perform tests or to refrigerate sexual-assault victim's clothing because "this evidence was simply an avenue of investigation that might have led in any number of directions"). But even if, as defendants maintain, Molina actually participated in the double murder, his request to his mother still did not exculpate either defendant because it did not eliminate the possibility that Arevalo and

Menjivar also had a role in the double murder. *Cf. Muhammad v. Kelly*, 575 F.3d 359, 367 (4th Cir. 2009) (FBI report indicating that "the sniper committing the shootings was likely acting alone" "was not exculpatory because the report did not definitively conclude that the killings were the work of a single shooter").

Further, defendants were able to obtain comparable evidence by other reasonably available means. In denying the motion to dismiss, the district court determined that defendants could obtain the same information by calling Molina's mother to testify and by cross-examining Molina himself. JA408. But defendants subsequently persuaded the court to prohibit the government from calling Molina, JA429, JA566, and defendants never called Molina or his mother to testify. Nonetheless, Arevalo called Detective McAllister, who confirmed that a Spanish-speaking investigator told her he had listened to Molina's jail calls, and Molina appeared to be asking his mother to provide an alibi for June 22, 2019. JA1906, JA1910. Further, Arevalo played clips of Detective McAllister's interview in which she confronted Molina's mother about this request. JA1910. Thus, the evidence was otherwise readily available to defendants. *See, e.g.*, *United States v. Matthews*, 373 F. App'x 386, 391 (4th Cir. 2010) (per curiam) (evidence depicted in unpreserved surveillance footage was otherwise available through cross-examination of detectives who stopped defendant's car).

Finally, dismissal was not warranted because, as the district court found, "[t]here is absolutely no evidence" that "the government destroyed the jailhouse tapes." JA1977. The ADC's audit trails indicated that Detective Rodriquez had accessed Molina's jail calls but did not download copies of those calls. JA2675. Further, "[t]he ADC's call system has a two-year retention period, and calls made or received more than two years in the past are purged from the system." JA2675–2676. That the recordings of Molina's jail calls were purged pursuant to the ADC's standard retention policy does not show bad faith. *See, e.g.*, *United States v. Montieth*, 662 F.3d 660, 666 n.1 (4th Cir. 2011) (failure to preserve videotape of traffic stop was not a due-process violation where "the tape had been subject to the police department's standard 90-day hold policy and was then routinely destroyed, with no bad faith on the part of law enforcement"). Additionally, to the extent any notes regarding the jail calls actually existed,[6] defendants have not shown that police acted in bad faith by failing to preserve them. *See, e.g.*, *United States v. McClure*, No. 90-5001, 1990 WL 180122, at *6 (4th Cir. Nov. 21, 1990) (per curiam) (no bad faith where the government represented in a pleading that a bank surveillance tape

---

[6] Detective McAllister maintained that "there was no official transcript ever written," JA1907, and she had "no notes" other than what she had already disclosed, JA1909.

was in the government's possession, but the tape was actually in the bank's possession and later destroyed by the bank).

### C. Prohibiting Molina from testifying remedied the late disclosure of the tipster's name and contact information.

Finally, defendants maintain that the district court should have dismissed the indictment because the government's late disclosure of the name and contact information of the December 2019 tipster violated *Brady*. "To succeed on a *Brady* claim," a defendant "must establish that the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial." *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018). Defendants failed to establish a *Brady* violation, let alone one that required dismissal.

As an initial matter, "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985). Here, on January 16, 2024, in response to an inquiry from defense counsel regarding a September 2023 document production, the government located and disclosed an email identifying the name and contact information of a woman who had reported in December 2019 that Molina and "Hector Naranjo" had bragged about committing the double murder. JA3396–3397. Defendants' trial did not begin until January 22, 2024. *See* JA430. Defendants made effective use of this material at trial by questioning Special Agent Fisher about the tip, JA1776–1780, introducing a

stipulation summarizing the tip, JA1888–1889, and arguing in closing that the tip supported defendants' theory that Guevara committed the double murder with Molina, JA2027–2028. Thus, even assuming the tipster's name and contact information were favorable and material, their "belated disclosure does not constitute reversible error." *Smith Grading & Paving, Inc.*, 760 F.2d at 532.

Additionally, this Court has made clear that "[a] continuance is the preferred sanction" for the government's failure to timely comply with a discovery order. *United States v. Sterling*, 724 F.3d 482, 512 (4th Cir. 2013). And "it would be a rare case where, absent bad faith, a district court should exclude evidence." *Id.*[7] Nonetheless, the district court accepted defendants' invitation, *see* JA3401, and ordered that Molina would not be "permitted to testify as a witness" at defendants' trial, JA429. That sanction was a "severe [] response to conduct that was not undertaken in bad faith" and could have been "remedied with a continuance." *Sterling*, 724 F.3d at 513. Defendants do not explain why prohibiting the government from calling Molina to testify, while permitting defendants to introduce a stipulation regarding the tip, was insufficient to remedy the asserted *Brady* violation. Nor do defendants articulate why the "extreme and inappropriate

---

[7] During the first trial, the district court stated that it did "not fault[] the U.S. Attorney's Office or [] the FBI [for] missing this." *See* Joint Appendix at 1501, *United States v. Sagastizado et al.*, No. 24-4251 (L) (4th Cir. Oct. 21, 2024), Doc. No. 43-4.

sanction" of dismissal of the indictment was otherwise necessary. *United States v. Hastings*, 126 F.3d 310, 317 (4th Cir. 1997).

### III. The district court did not abuse its discretion in denying defendants' motions for a mistrial and for a new trial.

Defendants contend that the district court should have declared a mistrial or granted them a new trial because of Turcios's improper closing argument. Although counsel's remarks were improper, the district court's strong curative instruction sufficiently remedied any prejudice to defendants.

An "improper closing argument may so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010); *see also, e.g., United States v. Merritt*, No. 96-4149 (L), 1998 WL 196614, at *5 (4th Cir. Apr. 22, 1998) (per curiam) (applying the same standard to a codefendant's improper closing argument). To determine whether a summation violated due process, the Court considers "(1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." *Lighty*, 616 F.3d at 359; *see also, e.g., United States v. Garcia*, 405 F.3d 1260, 1272 (11th Cir. 2005) (per curiam) (applying similar two-part test to a codefendant's improper closing argument).

This Court reviews the denial of a motion for a mistrial for an abuse of discretion, and will "disturb[]" that ruling "only under the most extraordinary of

64

circumstances." *United States v. Dorlouis*, 107 F.3d 248, 257 (4th Cir. 1997).

Likewise, "[a] court should exercise its discretion to grant a new trial sparingly," and

this Court reviews the denial of such motion for an abuse of discretion. *United States*

*v. Chong Lam*, 677 F.3d 190, 203 (4th Cir. 2012).

At the first step, Turcios's remarks were improper.  Specifically, Turcios's

counsel commented on her client's decision not to testify, JA2063–2064; vouched

for the credibility of Figueroa and Lemus, JA2064–2065; attempted, without prior

notice, to exculpate Turcios by pointing the finger at Arevalo, JA2064–2065,

JA2070; and argued facts not in evidence, JA2068.  Consequently, the district court

found, and the government agreed, that Turcios's closing argument was

"inappropriate" "almost from the beginning."  JA2102; *see* JA2360–2363.

At the second step, however, neither defendant has shown that Turcios's

improper remarks prejudiced his substantial rights.  As the district court determined,

the evidence of defendants' guilt was "overwhelming."  JA2504.  The jury heard

that after Menjivar and Canales gave the observaciones three months to "[s]tart

killing people to go up in rank," JA860, Arevalo and others started "going out with

weapons looking for some people to kill," JA862.  When Arevalo heard that Beltran

had told members of another MS-13 clique that he "was a Sureño," Menjivar

directed Arevalo and Guevara to investigate Beltran "to make sure that he was a

Sureño."  JA921–922.  Arevalo worked to earn Beltran's trust by hanging out with

him and giving him money to buy beer. JA1289. The government corroborated Guevara's testimony on this point with phone records showing Arevalo's attempts to communicate with Beltran in the weeks preceding his murder. *See* JA1723–1731.

Eventually, Arevalo recorded Beltran saying that "he was a Sureño," then sent the recording to Menjivar, who obtained permission from STLS leadership in El Salvador to "take action" against Beltran. JA922–923. STLS started looking for Beltran in locations he was known to frequent, but it took time to find him. JA923. The government corroborated this testimony, too, with WhatsApp messages. In a May 21, 2019, conversation, Guevara asked Arevalo, "What about the hen that [Turcios] said was over by La Americana?" JA3698. Guevara was referring to Beltran, JA930, and La Americana was a grocery store near where Arevalo, Guevara, and Turcios located Beltran on the night of the murder, JA923–924.

Guevara detailed how, on the night of June 21, 2019, he, Arevalo, and Turcios went out looking for Beltran, Arevalo learned that Beltran was behind the gas station across from La Americana, Arevalo picked up Beltran and Mayorga, brought them to the woods where Guevara and Turcios were waiting, and they shot and killed both men. JA955–961. WhatsApp messages corroborated Guevara's account. In response to Menjivar's request for "a report," JA3766, Guevara sent him a paragraph describing the double murder, *see* JA3767. Meanwhile, Guevara also shared a draft report about the double murder with Arevalo. *See* JA3841. Arevalo replied, "It's

66

fine, just review it again and correct the misspelled words." JA3842. Notably, Arevalo sent this message from a WhatsApp account linked to a phone number that, just weeks later, on July 11, 2019, he told police was his phone number. JA824–826. Figueroa's testimony about the phone call she overheard between Andrade and Guevara, JA1618–1619, similarly corroborated Guevara's testimony.

Further, "the comprehensiveness of the [c]ourt's instructions to the jury," JA2504, remedied any prejudicial effect of Turcios's summation. Indeed, "this Court has concluded that curative instructions eliminate prejudice from improper closing arguments even when comments are both misleading and extensive." *United States v. Benson*, 957 F.3d 218, 235 (4th Cir. 2020). Here, the district court gave a strong curative instruction, admonishing the jury "to completely disregard the entire closing argument offered by Ms. Van Pelt on behalf of her client, Mr. Turcios Villatoro." JA2111. The court added that the jury "may not use any of the information or arguments she offered as you deliberate in this case." JA2111.

"[O]ur legal system presumes that jurors will attend closely the particular language of [the court's] instructions in a criminal case and strive to understand, make sense of, and follow them." *Samia v. United States*, 599 U.S. 635, 646 (2023); *see Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("juries are presumed to follow their instructions"). Defendants maintain that this case presents a "context[] in which the risk that the jury will not, or cannot, follow instructions is so great, and

67

the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Def. Br. 68 (quoting *Bruton v. United States*, 391 U.S. 123, 135 (1968)).

This case "fall[s] outside the narrow exception" recognized in *Bruton*. *See Richardson*, 481 U.S. at 208. Unlike the facially incriminating confession of a codefendant introduced as evidence in *Bruton*, the arguments of Turcios's counsel were not evidence. *See, e.g.*, *United States v. Pérez-Vásquez*, 6 F.4th 180, 201 (1st Cir. 2021) ("Because closing arguments are not evidence, the district court did not manifestly abuse its discretion in denying the motion for a mistrial based on [a codefendant's] closing argument."). The district court correctly instructed the jury that "statements and arguments of counsel [] are not evidence in the case unless made as an admission or stipulation of fact." JA2110–2111. The court repeatedly instructed the jury that it must base its verdict "only on the evidence received during the trial." JA2111; *see* JA2109. Accordingly, "[i]t is [] highly unlikely that the jury was [misled] because the district court instructed the jury that the arguments of counsel were not evidence." *Lighty*, 616 F.3d at 362.

Defendants offer three reasons why the court's curative instruction was insufficient. First, defendants claim that the instruction "created a risk that the jury would discount all defense closing arguments, especially given the jury's knowledge of defense coordination." Def. Br. 69. But the instruction was clearly limited to

Turcios's remarks.  The court first advised the jury that "Carlos Jose Turcios Villatoro, that is Oculto, Ms. Van Pelt made improper and inappropriate statements." JA2111.  The court then instructed the jury "to completely disregard the entire closing argument offered by Ms. Van Pelt on behalf of her client, Mr. Turcios Villatoro." JA2111.  The instruction did not reference Menjivar, Arevalo, or their counsel.  Further, the court specifically instructed the jury to "infer nothing with respect to the defendants or any element of any offense with which they are charged from the interaction of defense attorneys within this trial."  JA2125.  The court also made clear that the jury must "give separate and personal consideration to the case of each defendant."  JA2126.  The court added, "[t]he fact that you return a verdict of guilty or not guilty to one defendant should not, in any way, affect your verdict regarding any other defendant."  JA2126.

Next, defendants assert that "severance was required because of the antagonistic defense Turcios planned."  Def. Br. 69.  The government agrees that it was procedurally improper for Turcios to point the finger at Arevalo for the first time in closing argument without giving notice.  But the government does not agree that the district court abused its discretion by denying severance.  There is no "bright-line rule[] mandating severance whenever codefendants have conflicting defenses," and "[m]utually antagonistic defenses are not prejudicial *per se*."  *Zafiro v. United States*, 506 U.S. 534, 538 (1993).  Mere "finger pointing" does not require

severance. *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002). Instead, "[t]here must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other," or that "the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id.*

The facts of this case parallel those of *Lighty*. In that case, Kenneth Lighty, James Flood, and Lorenzo Wilson were charged with a kidnapping and murder. *See* 616 F.3d at 336. Lighty and Flood proceeded to trial together; Wilson was tried separately. *See id.* At trial, Flood's defense "was that he did not participate" in the kidnapping and murder, "premised on the argument that there were only two individuals involved" in the crimes: Lighty and Wilson. *Id.* at 349. Lighty's defense "also centered on a denial of participation." *Id.* Lighty "largely attacked the credibility of the government's witnesses," but also argued that the two kidnappers could have been Flood and a fourth man, Tony Mathis. *Id.*

This Court held that the conflicting defenses did not require severance. "[T]o convict Lighty, the jury was not required to believe Flood's defense that he was not a participant" in the kidnapping and murder or Flood's defense "that Lighty and Wilson were responsible." *Id.* "Rather, to convict Lighty, the jury was required to find that he aided and abetted the kidnapping, murder, and the possession of the firearms." *Id.* Thus, "the jury was free to disbelieve both Lighty's and Flood's

70

versions of the events and conclude they both participated in the [] kidnapping and murder." *Id.*

Likewise, here, any conflict in Arevalo and Turcios's defenses did not require severance. Arevalo argued that it was Guevara and Molina, not Arevalo, who killed Beltran and Mayorga. JA2026. Turcios, by contrast, argued that Figueroa was "telling the truth," JA2065, when she described overhearing a conversation in which Guevara told Andrade he committed the double murder with Arevalo. Alternatively, Turcios argued that Guevara "was driving around that night with someone else, maybe" Molina, "[t]hey stop[ped] at the Seven Mart," "they saw" Beltran, and Guevara "and whoever was with him lured him with drugs into the woods, shot and killed him and stabbed" Mayorga. JA2068–2069. To convict Arevalo, the jury was not required to accept either of Turcios's arguments claiming that he did not participate in the double murder. Instead, "the jury was free to disbelieve both" Arevalo's and Turcios's "versions of the events and conclude they both participated" in the double murder. *See Lighty*, 616 F.3d at 349. And both the Supreme Court and this Court have concluded that the "risk of prejudice" from conflicting defenses "can be cured with proper instructions," like those given here. *See Zafiro*, 506 U.S. at 540; *Najjar*, 300 F.3d at 475.

Defendants maintain that the "timing" of Turcios's antagonistic defense "robbed Arevalo and Menjivar of the opportunity to respond," and that Turcios's

71

defense "allowed the false impression that counsel for Turcios had inside knowledge from working together." Def. Br. 69. But these complaints assume that the jury considered Turcios's summation in reaching their verdicts, contrary to the district court's specific instructions "to completely disregard" Turcios's counsel's "entire closing argument" and not to "use any of the information or arguments she offered as you deliberate in this case." JA2111. The record does not support that the jury ignored the court's clear warnings.

Defendants further assert that Turcios's remarks "undid a pillar of the defense: that Guevara's testimony was provably false, as demonstrated by the defense teams' joint presentation regarding the Exxon." Def. Br. 69. But Turcios's counsel also tried to discredit Guevara, arguing that he was "what a sociopath looks like." JA2065. Regarding Guevara's testimony about how Arevalo heard Beltran's voice behind the gas station, Turcios's attorney asserted, "We know that that didn't happen." JA2068. Counsel further suggested that Guevara was lying, reasoning that "[i]f they really wanted to get [Beltran] this night, [Guevara] said he knew where his house was, he would have been waiting outside." JA2069. Thus, Turcios's closing argument reinforced that the jury should disbelieve Guevara. And to the extent the defense teams argued that it was not possible for Arevalo to have heard Beltran from inside the gas station, JA2034–2035, that contention was inapposite, given that Guevara never testified that Arevalo was *inside* the store when he heard Beltran's

voice. *See* JA956 ("[W]hen [Arevalo] was at the gas station and went towards where we were in the car, he told us he had heard a voice that sounded like Milton's behind the trashcan of the gas station.").

Finally, defendants claim that "the emotional tenor of the argument left a lasting impression," which could not "be readily cured" by the court's instruction. Def. Br. 69. "Unlike the district court," this Court does "not have the benefit of having witnessed [counsel's] remarks, the jury's reaction to those remarks, or the jury's understanding of the instructions." *Chong Lam*, 677 F.3d at 205. Therefore, the Court should "decline to hold that the district court's conclusion that its curative instructions had their intended effect and that a new trial was not required in the interest of justice constituted an abuse of discretion." *Id.*

## IV.     The district court did not err in declining to set aside the jury's special finding on Count One.

Finally, Arevalo argues the district court erred in denying his motion for a judgment of acquittal or a new trial because special finding three of Count One was inconsistent with the jury's acquittals on Counts Nine, Ten, and Eleven. This Court reviews the denial of a Rule 29 motion de novo. *United States v. Green*, 599 F.3d 360, 367 (4th Cir. 2010).[8]

---

[8] In the district court, Arevalo also challenged the sufficiency of the evidence supporting the special finding. *See* JA2258–2259. Arevalo does not renew that challenge on appeal. *See* Def. Br. 71–75.

The district court correctly concluded that "the jury's determinations as to special finding three and the separate substantive counts are not wholly irreconcilable." JA2499. Count One charged Arevalo with racketeering conspiracy. Having found Arevalo guilty of Count One, the jury further found that, "as part of that offense, the defendant, on or about August 29, 2019, while aiding and abetting others, did willfully, deliberately, maliciously, and with premeditation kill" Tate. JA2233. Meanwhile, the jury acquitted Arevalo of Counts Nine, Ten, and Eleven, which charged him with VICAR conspiracy to murder Tate, VICAR murder of Tate, and use of a firearm during a crime of violence causing the death of Tate, respectively.[9] Unlike Count One, Counts Nine and Ten required the government to prove that Arevalo's "general purpose" in committing the charged crimes of violence "was to maintain or increase [his] position in the [racketeering] enterprise." *Fiel*, 35 F.3d at 1003. Thus, the verdicts were not necessarily inconsistent because the jury could have found that, as part of the racketeering conspiracy, Arevalo aided and abetted Tate's murder, but that he lacked the requisite VICAR purpose. *Cf. Ayala*, 601 F.3d at 265 (concluding, with respect to racketeering conspiracy and VICAR murder conspiracy, that "a jury could find a defendant guilty of one offense without necessarily finding him guilty of the other and vice-versa").

---

[9] Count Ten was the predicate crime of violence supporting Count Eleven. JA215.

But even if the verdicts were inconsistent, Arevalo is not entitled to relief. "[T]he Supreme Court has made it clear that a defendant cannot challenge his conviction merely because it is inconsistent with a jury's verdict of acquittal on another count." *United States v. Thomas*, 900 F.2d 37, 40 (4th Cir. 1990) (citing *United States v. Powell*, 469 U.S. 57 (1984)). "[A]n inconsistent verdict can result from mistake, compromise, or lenity, and a jury could just as likely err in acquitting as in convicting." *United States v. Louthian*, 756 F.3d 295, 305 (4th Cir. 2014). "So a reviewing court's assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *United States v. Legins*, 34 F.4th 304, 316 (4th Cir. 2022). Therefore, the jury's acquittals of Arevalo on Counts Nine, Ten, and Eleven do not undermine the jury's special finding on Count One. *See, e.g.*, *United States v. Hunt*, 99 F.4th 161, 187 (4th Cir. 2024) ("the mere fact that [the defendant] was acquitted on the counts arising from [two murders] does not undermine his conviction of the RICO conspiracy"); *United States v. Tinsley*, 800 F.2d 448, 451–52 (4th Cir. 1986) (per curiam) (upholding convictions for racketeering conspiracy and substantive racketeering notwithstanding acquittal on telephone facilitation charge, which was also charged as a predicate racketeering act).

Arevalo relies on a footnote in *Powell* in which the Supreme Court advised that "[n]othing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other." *Powell*, 469 U.S. at 69 n.8. But this "exception only operates in those situations where a jury has convicted a defendant of two crimes and those *convictions* are mutually exclusive." *United States v. Gross*, 961 F.2d 1097, 1107 (3d Cir. 1992). Here, Arevalo complains that the *acquittals* are inconsistent with a special finding on a count of conviction. "As *Powell* makes clear, inconsistency between acquittals and convictions may result from jury lenity and does not merit reversal of the convictions." *Id.* Nor does an exception exist where a defendant identifies "a significant contradiction between a jury's general verdict and its special verdict regarding the same count." *United States v. Agofsky*, 516 F.3d 280, 284 (5th Cir. 2008) (rejecting defendant's reliance on *Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385 (1972), because the Supreme Court subsequently reaffirmed in *Powell* that inconsistent verdicts are not reviewable).

Arevalo also claims that the special verdict form, which required the jury to check "yes" or "no," rather than "guilty" or "not guilty," permitted the jury to make a finding that exposed Arevalo to increased punishment without having found these facts beyond a reasonable doubt. Def. Br. 74–75. Arevalo did not raise this

objection to the form of the special findings in the district court. *See* JA1924–1926. In any event, the verdict form required the jury to find Arevalo guilty of the offense charged in Count One before answering the questions regarding the special findings. *See* JA2232; *cf. United States v. Ramirez-Castillo*, 748 F.3d 205, 214 n.6 (4th Cir. 2014) (recognizing that "had the district court asked the jury to first determine [the defendant's] guilt," "then provided it with a special verdict form to make certain factual findings, this might be a different case"). The district court repeatedly instructed the jury that "when answering those questions, you must be unanimous in whether the government has proven beyond a reasonable doubt the question that's being asked." JA2144; *see also* JA2169. Therefore, the record confirms the special finding complied with constitutional requirements.

## Conclusion

The Court should affirm the judgments of the district court.

Respectfully submitted,

Erik S. Siebert
United States Attorney

_____ /s/ _____

Jacqueline R. Bechara
Assistant United States Attorney

77

**Statement Regarding Oral Argument**

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

**Certificate of Compliance**

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 365.

Consistent with the Court's order granting leave to file a brief not in excess of 17,821 words, Doc. No. 66, I further certify that this brief is specifically 17,810 words as counted by Microsoft Word, excluding the table of contents, table of authorities, signature block, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/
_____
Jacqueline R. Bechara
Assistant United States Attorney
