# 24-4308(L), 24-4325

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔉𝔬𝔲𝔯𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

UNITED STATES OF AMERICA,

*Plaintiff/Appellee*,

— v. —

CRISTIAN ARIEL AREVALO ARIAS, a/k/a Serio,
MARVIN MENJIVAR GUTIERREZ, a/k/a Astuto,

*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# **REPLY BRIEF OF APPELLANTS**

Bernadette Mary Donovan
DONOVAN & ENGLE, PLLC
1134 East High Street, Unit A
Charlottesville, Virginia 22902
(703) 895-3846

*Counsel for Appellant Arevalo*

Lawrence Hunter Woodward, Jr.
RULOFF, SWAIN, HADDAD, MORECOCK,
TALBERT & WOODWARD, P.C.
317 30th Street
Virginia Beach, Virginia 23451
(757) 671-6000

*Counsel for Appellant Menjivar*

CP COUNSEL PRESS      (800) 4-APPEAL • (JOB 813325)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................... ii

INTRODUCTION ......................................................................1

1. The Government Conferred a Significant Benefit on Its Star Witness and Then Insulated Him from Proper Cross-Examination ..........................................................................................2

2. This Case Was Irreparably Infected with Due Process Violations That Culminated in the Deportation of a Favorable Witness.................10

    i. The Government Misstates the Standard ........................................11

    ii. The Government Fails to Recognize the Obvious Exculpatory Nature of Vasquez's Testimony ...............................12

    iii. If Bad Faith is an Element of This Claim, Arevalo and Menjivar Have Met It......................................................................19

    iv. Other Due Process Issues Heightened the Prejudice Caused by Vasquez's Deportation ............................................................21

3. The Only Appropriate Remedy for Turcios's Closing Argument Was a Mistrial.....................................................................................25

4. The Special Findings Are Unconstitutional ............................................37

CONCLUSION ........................................................................38

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000)................................................................37

*Bruton v. United States*,
    391 U.S. 123 (1968)......................................................31, 32, 33

*Coleman v. United States*,
    420 F.2d 616 (D.C. Cir. 1969)..............................................28

*Delaware v. Van Arsdall*,
    475 U.S. 673 (1986)...........................................................2, 9

*Hartzell v. United States*,
    72 F.2d 569 (8th Cir. 1934) ......................................................8

*Hoover v. State of Maryland*,
    714 F.2d 301 (4th Cir. 1983) ...............................................5, 7

*Krulewitch v. United States*,
    336 U.S. 440 (1949)................................................................31

*Muhammad v. Kelly*,
    575 F.3d 359 (4th Cir. 2009) ...............................................10

*Richardson v. Marsh*,
    481 U.S. 200 (1987)................................................................31

*Stewart v. United States*,
    366 U.S. 1 (1961)...................................................................30

*United States v. Batjargal*,
    302 F. App'x 188 (4th Cir. 2008) .........................................28

*United States v. Carlos Turcios Villatoro*,
    No. 24-4358 (Jan. 14, 2025) .................................................28

*United States v. Caudle*,
    606 F.2d 451 (4th Cir. 1979) ..................................................8

*United States v. De La Cruz Bellinger*,
    422 F.2d 723 (9th Cir. 1970) ................................................28

*United States v. Gaudin*,
　515 U.S. 506 (1995)..................................................................38

*United States v. Hill*,
　322 F.3d 301 (4th Cir. 2003) ....................................................6

*United States v. Kaixiang Zhu*,
　854 F.3d 247 (4th Cir. 2017) ..................................................19

*United States v. Lighty*,
　616 F.3d 321 (4th Cir. 2010) ..................................................25

*United States v. McCarty*,
　82 F.3d 943 (10th Cir. 1996) ....................................................6

*United States v. Mena*,
　863 F.2d 1522 (11th Cir. 1989) ..............................................28

*United States v. Purkey*,
　428 F.3d 738 (8th Cir. 2005) ....................................................6

*United States v. Rabinowitz*,
　578 F.2d 910 (2d Cir. 1978) ......................................................6

*United States v. Ramirez-Castillo*,
　748 F.3d 205 (4th Cir. 2014) ..................................................38

*United States v. Valenzuela-Bernal*,
　458 U.S. 858 (1982)....................................................11, 12, 13

*United States v. Wilson*,
　155 F.3d 291 (4th Cir. 1998) ..............................................29, 33

*Wolfe v. Clarke*,
　691 F.3d 410 (4th Cir. 2012) ..................................................10

*Wolfe v. Dotson*,
　No. 24-6840, ___F.4th ___, 2025 WL 1859732 (4th Cir. July 7, 2025)............10

**Statutes & Other Authorities:**

Federal Rule of Evidence 403 .................................................................8

Federal Rule of Evidence 611 .................................................................8

Va. Code § 18.2-61 ..................................................................................3

## INTRODUCTION

Cristian Arevalo Arias and Marvin Menjivar Gutierrez should not spend the rest of their lives in prison based on the proceedings below. Simply put, their convictions are not the result of a fair trial in which this Court can have confidence. Rather, their convictions stem from a questionable investigation that included the secret deportation of an exculpatory witness and misrepresentations from Prince William County Police about favorable evidence. At trial, both Arevalo and Menjivar attempted to defend themselves but were hamstrung by due process violations. They were then further hindered by restrictions on their cross-examination of the government's star witness, Mario Guevara Rivera.

If Arevalo and Menjivar retained any chance for a fair trial, that was robbed from them in closing, when counsel for codefendant Carlos Turcios Villatoro delivered an argument that the government has consistently agreed "was replete with arguments that we believe were improper." JA2461. Initially, the trial court agreed that a mistrial and severance should result, observing that it was the relief "most likely [to] cure the problem that's been raised[.]" JA2097; *see also* JA2098 ("My initial thinking is to sever out the case such that . . . [Arevalo and Menjivar] would have to stand trial again").

After a brief recess, the court chose to instead give the jury a cautionary instruction. But even months later, the court was unsatisfied. The court observed

that the argument had "made it extremely difficult to see whether or not the case could go forward," and that the court was "still . . . wrestling with this issue because I do think it created a huge problem." JA2459. The court then admonished the government "as officers of the Court, you also have to be mindful, as much as you would like not to have to retry this case, whether in the interests of justice, it ought to be retried because of what happened." JA2459.

In other words, months after trial, the prejudicial impact of Turcios's closing argument continued to weigh on the district court. In the unusual circumstances of this case—where the government admits that the codefendant's closing argument was so improper as to be wholly struck, and the impact of that argument weighed heavily months later—it is impossible to say that Arevalo and Menjivar were not prejudiced. It is constitutionally intolerable for Arevalo and Menjivar to spend the rest of their lives in prison based on such a trial, and this Court should grant them both relief.

## 1. The Government Conferred a Significant Benefit on Its Star Witness and Then Insulated Him from Proper Cross-Examination.

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). That is exactly what happened here: Arevalo and Menjivar were prohibited from cross-examining the

2

government's star witness about his benefits. The government defends these limitations, downplaying Guevara's importance and the relevance of the cross-examination. But for six main reasons, the government is wrong.

*First*, the government repeatedly mischaracterizes the issue. The issue is not whether Arevalo and Menjivar could cross Guevara about irrelevant allegations. The issue is whether the district court properly barred Arevalo and Menjivar from cross-examining Guevara about *a benefit he received and hoped to continue receiving*: avoiding prosecution for serious crimes. This type of benefit is "a prototypical form of bias."

In this case, both Guevara and ███████████████ were cooperating witnesses. ██████████████████████████████████████ ████████████████████████████████████ *See* JA2696–2700. ████████████████████████████████

███ JA2611, exposing Guevara to multiple life sentences in state court. *See* Va. Code § 18.2-61. When questioned by the government about these allegations, Guevara denied them. JA2611.

The government then had a dilemma. ███████ was an ancillary witness, while Guevara was their star. If the government chose to believe ███████ ████████████████████████████████████—it would mean that Guevara (1) was lying and (2) faced additional legal exposure. But if the

3

government chose to believe Guevara, it could both protect him from additional charges and maintain his appearance of credibility. The government chose the latter course, conferring an immense benefit upon Guevara.

Incredibly, the government argues that Guevara did not have an incentive because "Guzman's allegations were unsubstantiated," "Guzman never reported these incidents to the police, and the government was unable to locate any evidence confirming or refuting her claims."[1] Brief of United States ("Response") at 41–42. These arguments are more like the protestations of a defense attorney representing Guevara than those of a prosecutor. ██████████████ frequently goes unreported, and allegations of ████████████████████ often cannot be corroborated. This does not stop prosecutors from pursuing either type of crime when a victim reports it. ██████████████████████████████████████ ████████████████████████████████

Simply put, the government made a choice to side with Guevara, not ████████ This was an unusual choice, as prosecutors rarely outright dismiss a victim's allegations in favor of the alleged perpetrator. And although the government might not have "immunized Guevara," Response at 42, it did not have

---

[1] The government has never described any efforts to "locate any evidence confirming or refuting ████████ claims."

to. All the government had to do was decline to refer Guevara to the

Commonwealth, a status quo he had a strong interest in maintaining.

It also does not matter that "defense counsel would not have been able to

introduce evidence to prove ███████ if Guevara denied them." Response at 41.

It was the benefit that mattered. On cross, Guevara would have admitted that he

was aware of these allegations, that he was not facing prosecution for them, that

the government had not referred him to the Commonwealth, and that he did not

want to be prosecuted for ███. Guevara would have been cross-examined about

the fact that his sentence reduction would be less meaningful if he were prosecuted

for ███████, subjecting him to possible state incarceration and ███████

███████. In other words, the jury would have understood Guevara's bias,

regardless of whether he denied the allegations.[2] *See Hoover v. State of Maryland*,

714 F.2d 301, 305–306 (4th Cir. 1983) (holding defendant entitled to cross on

witness's "subjective understanding of his bargain," including whether he

"expected the prosecutor to intervene on his behalf in other, apparently unrelated,

pending criminal matters").

---

[2] Notably, Guevara ████████████████████████████████
████████████████████████████████████████
██████████████████ JA2611. Prosecutors usually would treat such a
response as minimization, but Guevara received the benefit of the doubt.

*Second*, the government argues that Arevalo and Menjivar cannot show a viable claim because Guevara admitted that he hoped to get a sentence reduction and avoid removal. Response at 39–40. In support of this argument, the government cites *United States v. Purkey*, 428 F.3d 738, 753–54 (8th Cir. 2005), in which a witness admitted that his "sole point" in testifying was to receive a sentence reduction. Setting aside the question of whether this out-of-circuit case is consistent with Fourth Circuit precedent, it is inapposite. Here, Guevara admitted hoping for some benefits, but also claimed that he cooperated "because [he] didn't want to be part of the gang anymore" and he "sort of grew up, and what [he] was doing was senseless." JA832. Unlike the witness in *Purkey*, Guevara denied that he was cooperating solely to receive a benefit.

Similarly, the government argues that the district court could bar this cross-examination because " ▆▆▆▆▆ allegations were unsubstantiated." Response at 41–42 (citing *United States v. McCarty*, 82 F.3d 943, 949–50 (10th Cir. 1996); *United States v. Hill*, 322 F.3d 301, 305 (4th Cir. 2003); *United States v. Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978)). Each of the cited cases is also inapposite, because none of them concern a witness who has received the benefit of non-prosecution. Instead, these cases concern a defendant's desire to cross the witness about an unrelated crime that does not bear on bias. In other words, none

of the cases cited concern a witness's "subjective understanding of his bargain."
*See Hoover*, 714 F.2d at 305–306.

*Third*, the government is wrong that Guevara's sexual gratification motive was unimportant. The government advances two arguments. One is that "the question before the jury was whether Arevalo and Menjivar, not Guevara, acted with the requisite purpose." Response at 44. The other is that "[e]ven assuming Guevara had an additional, sexual-gratification motive for committing the murders, the purpose requirement" could be satisfied against Arevalo and Menjivar. *Id.*

Obviously, the value of this evidence was not to negate the purpose element, but to call into question Guevara's *whole account* of the crimes. For example, Arevalo's counsel argued that Guevara had committed the double murder without him for his own reasons. Arevalo's cross thus emphasized Guevara's personal taste for violence. JA1061–1062, JA1098–99, JA1142. Similarly, Menjivar—charged solely on the theory that he had greenlit the Beltran murder—emphasized evidence that Guevara killed for his own excitement, not at Menjivar's direction. JA1262–1264. Evidence of Guevara's sexual response to the murders corroborated the defense theory that Guevara was an eager killer who murdered for his own gratification and was implicating Arevalo and Menjivar for his own selfish reasons.

*Fourth*, the government argues that there is "no rule or case law" allowing the defense to cross-examine a witness on his tendency to downplay his own criminal behavior. Response at 43. Of course there is. Rule 611 of the Federal Rules of Evidence permits cross on "matters affecting the witness's credibility." The defense theory was that Guevara, the actual killer, was downplaying his own involvement and motives. Proof that Guevara downplayed his own criminal involvement throughout this investigation thus went right to his credibility.[3]

*Fifth*, the government argues that cross was properly restricted under Rule 403 of the Federal Rules of Evidence because it would have been emotional, a waste of time, confusing, and cumulative. Response at 45–47. But this Court has recognized that "it 'is only *after* the right of cross-examination has been substantially and thoroughly exercised that the allowance of further cross-examination becomes discretionary with the trial court." *United States v. Caudle*, 606 F.2d 451, 458–459 (4th Cir. 1979) (emphasis added) (quoting *Hartzell v. United States*, 72 F.2d 569, 585 (8th Cir. 1934)) (collecting cases). The trial court

---

[3] The government strains credulity by suggesting that the fact that Guevara "admitted that he provided Arevalo the gun used to kill Tate" proves he did not downplay his crimes. Response at 43. As the government well knows, Arevalo's theory was that it was Guevara—not him—who killed Tate. Indeed, Guevara was charged with the Tate murder in state court. *See* JA1068–1069. Guevara's self-serving statement that he provided his own gun to *Arevalo* to kill Tate is thus hardly an example of him taking responsibility.

does *not* have discretion to restrict cross-examination on a "prototypical form of bias." *See Van Arsdall*, 475 U.S. at 680. Furthermore, if this cross were merely cumulative, the government would not have filed a pretrial motion to prevent it.

*Finally*, the government argues that any error was harmless beyond a reasonable doubt. Response at 47–49. The government admits that "Guevara's testimony was certainly important," but suggests that "ample evidence from other sources . . . corroborated his testimony." Response at 48. What ample evidence? Guevara was the heart of the government's case, and his testimony was uncorroborated on the most important points. Indeed, Guevara was the sole witness who claimed (1) Menjivar greenlit the Beltran murder, (2) Arevalo participated in the double murder, and (3) Arevalo participated in the Tate murder.

To see Guevara's importance, one need only review the government's "Statement of the Case." When summarizing its evidence, the government relies almost exclusively on Guevara. By undersigned counsel's count, all six of the citations under "Menjivar and Canales order members of the clique to commit murders" are attributable to Guevara. Response at 5. Twenty-seven of twenty-nine citations under "Arevalo and other STLS members kill Eric Tate" are also to Guevara. Response at 11–13. And a stunning forty-one of forty-two citations under "Defendants kill Milton Beltran Lopez and Jairo Geremeas Mayorga" are to Guevara's testimony. Response at 5–8. By undersigned counsel's count—and the

government's own summary—there is no case against Arevalo or Menjivar *without* Guevara.

Although Guevara was the most important witness, it is an overstatement to suggest that his cross "spanned multiple hours over three days of trial." Response at 48. Guevara's direct began on January 23 and lasted most of January 24. JA828–1049. His cross began towards the end of the 24th but was interrupted on the 25th by the government calling a witness out of order. JA1049–1229. Guevara's cross was completed that day, and he was briefly redirected and recrossed the following morning. JA1330–1374. Anyway, a meaningful cross-examination is a matter of quality, not quantity. That is why when the government learned information that would be fatal to Guevara's credibility, it fought pretrial to bar the defense from crossing him on it.

## 2. This Case Was Irreparably Infected with Due Process Violations That Culminated in the Deportation of a Favorable Witness.

The murders underlying this case occurred in Prince William County, a jurisdiction known for mishandling exculpatory evidence.[4] Ultimately, the repeated mishandling of favorable evidence in this case made it impossible for Arevalo and

---

[4] *See Wolfe v. Dotson*, No. 24-6840, ___F.4th ___, 2025 WL 1859732 (4th Cir. July 7, 2025); *Wolfe v. Clarke*, 691 F.3d 410, 423–24 (4th Cir. 2012); *Muhammad v. Kelly*, 575 F.3d 359, 370 (4th Cir. 2009).

Menjivar to secure a fair trial. The interrelated due process violations culminated in the deportation of a favorable witness, warranting dismissal of the indictment.

     *i.    The Government Misstates the Standard.*

The government argues that Vasquez's removal did not violate due process because the defendants cannot show he would have testified. This Court should reject that argument for two reasons. *First*, Arevalo and Menjivar do not need to show that Vasquez would have willingly testified. The elements of this claim are (1) the government deported an alien witness and (2) "some showing that the evidence lost would be both material and favorable to the defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872–73 (1982).

The government cites no case for the proposition that defendants must show a deported witness would have testified willingly. Instead, the government argues that the trial court "correctly recognized that Vasquez 'said he would not cooperate' and 'would not testify,' so 'had he been kept here, we don't know whether, if [defendants] called him, he would have refused to say anything." Response at 51–52 (quoting JA1838). If anything, this supports the argument that the trial court erred by applying an incorrect standard.

Additionally, the court's speculation about whether Vasquez would have testified is just that—speculation. There is no evidence that Vasquez would have refused to testify, nor that he ever said he "would not testify." Similarly, the

government's argument that Vasquez would have "refused to testify" is speculative. Response at 51.

Vasquez made repeated statements to investigators about his conversations with Guevara and entered a guilty plea in which he admitted having knowledge of the double murder when he helped Guevara destroy his firearm. JA3521. Vasquez signed a statement of facts in which he admitted that Guevara had discussed the murders with him and that the two men had exchanged WhatsApp messages about the firearm. JA3523–3524. Vasquez later loaned Guevara a tool to destroy the gun, knowing that Guevara wanted to destroy evidence. JA3524. Vasquez personally stipulated that each of these facts was "true and accurate[.]" JA3526. Vasquez's plea agreement waived his trial rights. JA3467–3472. Under these circumstances, the contention that Vasquez would (or could) refuse to testify is pure speculation.

ii.    *The Government Fails to Recognize the Obvious Exculpatory Nature of Vasquez's Testimony.*

The government next argues that Arevalo and Menjivar failed to make "some showing that the evidence lost would be both material and favorable to the defense." *Valenzuela-Bernal*, 458 U.S. at 872–73. The government ignores the forgiving standard enunciated in *Valenzuela-Bernal*, which notes that defendants "cannot be expected to render a detailed description of their lost testimony." *Id.* at 873. The defense must only "make[] a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways

12

not merely cumulative to the testimony of available witnesses." *Id.* Arevalo and Menjivar easily meet and surpass this bar.

*First*, the government admits Vasquez "was a material witness *against* Mr. Guevara." JA418 (emphasis added). The government further admits that "[o]nce Mr. Guevara Rivera pled guilty and was cooperating, Mr. Vasquez did not have any information that could have helped or hurt the government's case *when it comes to other defendants in this case*." JA418–419. In other words, when Vasquez was a material witness against a *defendant*, the government considered him material. Once that defendant became an important government *witness*, Vasquez lost his value. But Vasquez did not suddenly change from material to immaterial. The only thing that changed was the party *for whom* Vasquez's material information was favorable.

*Second*, the fact that Vasquez was a material witness was obvious. At the start of this case, Abner Molina Rodriguez confessed to committing the double murder and was charged in Prince William. Molina never alleged that Arevalo or Menjivar were involved. JA2633–2634; JA2733–2984. Later, Molina became a federal cooperating witness. Then Guevara—who was charged with both the double murder and Tate murder in state court—became a cooperating witness. Guevara claimed that Molina was *not* a participant in the double murder, but

13

Arevalo was. Guevara also shifted blame for the Tate murder, claiming that he had given the murder weapon (his own gun) to Arevalo.

At trial, the government's theory was that Guevara was telling the truth: Arevalo had committed the double murder with him and Turcios. The defense theorized that Guevara and Molina had committed the double murder. Meanwhile, counsel for Menjivar theorized that Guevara was falsely attributing a directive to him. Regarding the Tate murder, the government theorized that Guevara was telling the truth and had given Arevalo his gun. The defense theorized that Guevara had committed the murder himself. It was thus obvious that evidence was favorable if it (1) tended to show Guevara had committed the double murder with Molina, (2) tended to show Guevara had committed the Tate murder, or (3) impeached Guevara's credibility. Vasquez fit all three categories.

The government misstates the extent of Vasquez's exculpatory evidence. The government admits that according to Vasquez, Guevara told him Molina had participated in the double murder. Response at 53 (citing JA3127–3128). But the government wrongly claims that Vasquez said this only once. *Id.* at 53 n.1. On December 5, 2019, Vasquez reported that Guevara had confessed the double murder and Molina had picked him up around that time. JA3198. On December 13, Vasquez reported not only that Guevara had confessed, but also that *Molina* did—a fact the government's Brief ignores. JA2680, JA2994–2996; JA3126–3130. On

14

December 20, Vasquez *again* reported that Guevara both confessed and "stated [Molina] was present for the homicide." JA2684. Vasquez thus *repeatedly* told investigators Guevara had committed the double murder with Molina, directly contradicting the government's theory and impeaching Guevara.

The government similarly misstates the value of Vasquez's statements with respect to the Tate homicide. Vasquez informed investigators that during one of *Guevara*'s murders—the shooting of a Black man—the decedent had pulled a gun. JA3041–3043. Tate was the only decedent who had pulled a gun, so Guevara's statements to Vasquez implicated *him* in that murder. The government's argument that "Vasquez appeared to be referring to the Smith murder" makes no sense, as there was no allegation that Smith was armed.[5] Indeed, one of the investigators who interviewed Vasquez admitted that she believed he was talking about the Tate homicide because Tate was the decedent who "shot back." JA1935.

*Third*, the government's Brief reflects an unconstitutionally narrow view of favorable evidence. For example, the government argues that "Vasquez said nothing about Arevalo, *presumably* because Vasquez did not know who Arevalo was." Response at 53 (emphasis added). This ignores the possibility that Vasquez

---

[5] Antonio Smith was another Black man randomly and admittedly killed by Guevara. Neither Arevalo nor Menjivar were charged with his murder. Counsel for Arevalo emphasized that randomly killing Black men walking alone appeared to be Guevara's *modus operandi*.

said nothing about Arevalo because—as he told investigators—Guevara admitted committing the double murder with *Molina*, *Molina* admitted participating in the double murder, and *Guevara* talked about killing Tate.

Relatedly, the government claims that "Vasquez's account was not exculpatory as to Arevalo, since it left open the possibility that Arevalo" was a participant in the double murder. Response at 53–54. Vasquez's account that Molina and Guevara confessed to him, and that Guevara confessed to committing the double murder with Molina, directly contradicts Guevara's testimony in this case. The government's inability to admit that this is favorable evidence reflects a disregard for basic *Brady* principles that should concern this Court.[6]

Similarly, the government's assessment of materiality—which asserts that "Vasquez's anticipated testimony suffered from multiple defects"—is itself defective. The government first claims that Vasquez "lacked personal knowledge" because he was not present for the murders and his information "was based on what Guevara had told him." Response at 52. For at least two reasons, this is wrong. One, the government charged Vasquez as an accessory after the fact. JA105. The government's *own theory* was that Guevara talked to Vasquez about

---

[6] Similarly, the government argues that Vasquez was not favorable because Guevara denied making these statements to Vasquez. Response at 55. That is precisely *why* it is favorable, especially given the government's own evidence that the two men discussed the double murder within days of its occurrence.

the double murders. Having obtained a conviction against Vasquez for his *knowing* assistance after the murders, the government cannot claim he had no relevant information. Two, the government's claim that Vasquez was unimportant because his knowledge was based on what Guevara said is ironic given its repeated reliance on co-conspirator statements. Indeed, the fact that Guevara told Vasquez about the double murder was a critical fact supporting Vasquez's guilty plea. JA3449.

Perhaps most disturbing is the government's assertion that "Vasquez 'was not deemed credible at any point by any law enforcement officer,' JA1947, and none of his statements was 'substantiated.'" Response at 52. The police and prosecution are not the arbiter of credibility; the jury is. Additionally, law enforcement *knew* Guevara had talked to Vasquez about the double murders and charged him on that basis. This was substantiated by WhatsApp messages exchanged by the Guevara and Vasquez days after the murders "in which they discussed destroying the firearm with a cutting tool." JA3523. By choosing which of Vasquez's statements to credit—those that helped the government—and discarding any others, the government usurped the jury's fact-finding role in this case.

The same fallacy informed the government's decision to allow Vasquez's deportation. Specifically, the government's defense was that Vasquez was "a material witness *against Mr. Guevara*" but "did not have any information that

could have helped or hurt *the government's case* . . . ." JA418–419 (emphasis added). In other words, once Vasquez became unnecessary for the government's case, the government was not concerned with keeping him in the country, despite recognizing that he was "a material witness" against the government's own star cooperator. The materiality of evidence is not defined by whether the government finds it credible or whether it supports the government's case. This mindset turns due process on its head.

*Fourth*, the government claims Vasquez's testimony would have been cumulative because the defense called Michelle McAllister, a PCPWD detective who was present for a Vasquez interview. Response at 54, 56. McAllister was hardly an adequate substitute for at least two reasons. One, McAllister was a hostile witness. The government called McAllister in its own case to testify about controlled drug buys against Arevalo, and she was the subject of a detailed, credibility-focused cross by Arevalo. JA1511, 1520–1562. McAllister also had a history of misrepresenting exculpatory evidence in this very case, as detailed below. Being forced to recall a hostile police witness who has misrepresented exculpatory evidence is hardly an adequate substitute for a favorable witness.

Two, because the defense had to rely on a hostile police witness, the government was able to minimize Vasquez. The government elicited testimony that Vasquez had been interviewed in an "unethical" manner, suggesting that he

had been the subject of police threats that could have "change[d] the truth."

JA1944. McAllister characterized Vasquez's recorded interview as "very unclear"

and "not productive." She claimed Vasquez "was not deemed credible at any point

by any law enforcement officer," an assertion belied by his charges in this case.

JA1947. The government ignores how Vasquez's deportation allowed the

government to substitute its own hostile witness and her credibility assessments for

his favorable information.

 *Finally*, the fact that the district court found interview clips of Vasquez

unhelpful weighs *in favor* of relief, not against it. *See* Response at 53. Although the

government quibbles with the details, it cannot be reasonably disputed that

Vasquez had favorable information. On the one hand, the government claims that

the defense had an adequate substitute in the form of McAllister and clips of the

recorded interview. But on the other hand, the government argues that the clips

were unhelpful. Most of Vasquez's statements were unrecorded, leaving the

defense to rely on police reports and one video. When the government deports an

exculpatory witness, it should not be able to benefit from its own poor

documentation.

  iii. *If Bad Faith is an Element of This Claim, Arevalo and Menjivar Have
    Met It.*

Whether bad faith is an element of this claim is an open question in this

circuit. *United States v. Kaixiang Zhu*, 854 F.3d 247 (4th Cir. 2017). But if it is an

19

element, Arevalo and Menjivar easily meet it. As the government acknowledges,

bad faith turns on the government's knowledge of a witness's exculpatory value.

Response at 57. And in this case, the government cannot deny that it had such

knowledge.

*First*, the government admits "that Guevara apparently told [Vasquez] that

Molina was present for the double homicide." The government further admits that

Vasquez was "a material witness against Mr. Guevara." *Second*, Vasquez's

statement of facts reflects the government's knowledge of his statements. *See* JA

3449 ██████████████████████████████████████████

███████████████████ Beltran and Mayorga). *Third*, the district court expressly

warned the government that Vasquez could be deported and asked if the

government wanted him as a witness. The government's answer: "No . . . .

Definitely not." JA3488. *Fourth*, although the government now claims Vasquez

was not cooperating, the government held both his plea and sentencing under seal.

JA2643–44. This deprived the defense of notice that might be deported.[7]

*Finally*, and perhaps most importantly, the district court described Vasquez

as "clearly . . . a witness who had relevant information," but opined that the

---

[7] The government faults the defense for not interviewing Vasquez "before he was
removed in July 2023." Response at 57. The defense cannot ethically interview
represented codefendants without permission. The government also faults the
defense for failing to subpoena Vasquez, even though he was deported well before
trial and even the United States government could not locate him.

government had acted in "foolishness," not bad faith. JA1838. But at the time of

deportation, it is inarguable that the government knew that Vasquez was a witness

against Guevara, that he supported the theory that Guevara had committed the

double murder with Molina, and that he supported the theory that Guevara killed

Tate. The fact that Vasquez's deportation was foolish does not mean that it fell

short of the bad faith standard.

> iv.  *Other Due Process Issues Heightened the Prejudice Caused by*
> *Vasquez's Deportation.*

As the Opening Brief makes clear, the core of this claim is that Vasquez's

deportation independently warranted dismissal but was exacerbated by the other

due process issues. Arevalo and Menjivar ask the Court to consider the full context

of this case, in which repeated due process violations hamstrung their defenses. In

particular, the defendants ask this Court to consider the government's repeated

failures to preserve and disclose critical evidence that contradicted its prosecution

theory and its reliance on Guevara.

As discussed *supra* Claim I, Guevara's credibility was a critical issue for

both Arevalo and Menjivar. As also discussed above, the fact that Molina had

confessed to committing the murder was an important fact to the defense. Vasquez

was central to both issues, as he could have testified not only that Guevara had

confessed to committing the murders *with* Molina, but also that Molina had

21

confessed. This core defense theory was repeatedly obstructed by the government's failure to preserve and disclose evidence.

*First*, the government failed to preserve evidence that Molina tried to convince his mom to alibi him for the double murder. Molina's efforts to concoct an alibi contradicted Guevara's testimony that he was not involved, corroborated Guevara's statements to Vasquez that Molina *was* involved, and undermined the government's theory. PWPCD recognized the value of this evidence against Molina and interviewed his mother about the calls. But by the time the defense learned about Molina's efforts, there were no calls, nor notes or reports documenting them. Indeed, Detective McAllister—the very witness the government now claims was an adequate substitute for Vasquez—denied that Molina had made these calls. *See* JA2638.

Later, evidence emerged substantiating the defense's belief, and McAllister finally admitted at trial that the call(s) had occurred. *See* Response at 60. But a single admission by a hostile witness who has previously misrepresented exculpatory facts is hardly a substitute for the favorable evidence. Nevertheless, the government argues that the destruction of Molina's alibi calls did not violate due process. First, the government claims that there is no evidence of destruction because Molina's calls were automatically purged. However, the calls were not purged until two years *after* they occurred. JA2675. A Prince William detective

accessed Molina's calls on January 27, 2020, and his mother was interviewed about them four days later. JA2638–39. This was only two months after Molina's confession and arrest, JA2733, meaning that the government had at least twenty-two months to ensure it preserved the calls before they were purged.

Second, the government claims that the alibi calls lacked apparent exculpatory value. Response at 59–60. This argument again reveals the government's narrow understanding of exculpatory evidence. When investigators heard Molina's call(s), they knew his efforts to concoct an alibi were evidence of *his* guilt, which is why they confronted his mother. At some point before the January 2022 indictment, the government decided that Molina was *not* guilty of the double murder and would instead be witness against Arevalo and Menjivar. *See* JA118–121. Obviously, when Person A is charged with a murder, evidence that Person B actually committed the murder is exculpatory. This is especially true when Person B confessed to the murder before recanting and becoming a government witness.

Nevertheless, the government argues that "even if . . . Molina actually participated in the double murder," his attempt to concoct an alibi "did not exculpate either defendant because it did not eliminate the possibility that Arevalo and Menjivar also had a role in the double murder." Response at 59–60. This ignores the fact that when Molina confessed, he claimed to have committed the

murders *alone*—not with Arevalo or Menjivar. It also ignores the fact that Molina's alibi efforts corroborated the defense theory. Finally, it ignores the fact that Molina's attempts to create an alibi were inconsistent with the government's theory, inconsistent with Molina's anticipated testimony, and inconsistent with Guevara's testimony. The fact that the government still cannot see the exculpatory value of this evidence is emblematic of the due process issues in this case.

Ultimately, Molina was barred from testifying. Days before trial, Arevalo and Menjivar learned that the government had withheld evidence that Molina and Guevara had confessed to *another* person in December 2019. JA3397. For years, the police had this person's identity and contact information but failed to disclose it. JA3397. This went right to the heart of the defense that Molina and Guevara had committed the double murder. It also went to Guevara's credibility, a key issue for both Arevalo and Menjivar. The government argues that the defendants were able to question the case agent about this tip. Response at 62. However, all the case agent could say was "that's what the tip reads." JA1780. That is hardly a substitute for calling a witness to whom Guevara and Molina confessed—especially when the government had deported the only other witness with similar information.

In sum, the government built a case around Guevara. Guevara was the only person who implicated Arevalo in the Tate murder, claimed to have committed the double murder with Arevalo, and claimed that the double murder was committed at

24

Menjivar's direction. But before he implicated Arevalo and Menjivar, Guevara told multiple people he had committed the double murder with Molina. Molina, who had confessed to the double murder, told the same people he was involved. This was obviously critical evidence for the defense, and yet it was repeatedly withheld and obfuscated. These due process violations culminated in the deportation of a witness the government knew was material against Guevara, hamstringing Arevalo and Menjivar. Dismissal of the indictments is a serious remedy, but one that was warranted here.

### 3. The Only Appropriate Remedy for Turcios's Closing Argument Was a Mistrial.

"An 'improper closing argument may so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" Response at 64 (quoting *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010)). This is that case. The government admits that Turcios's closing argument was improper for numerous reasons. And yet, the government claims that neither Arevalo nor Menjivar can show prejudice. But the government is trying to have it both ways. On the one hand, the government argues that Turcios's closing was so outrageous as to warrant being completely struck. On the other hand, the government asserts with great confidence that the prejudice was cured. For five main reasons, this Court should not share the government's confidence.

*First*, even the district court did not share this confidence. The trial court first suggested that Arevalo and Menjivar should both receive mistrials, observing that this was the avenue "most likely [to] cure the problem that's been raised[.]" JA2097. The court expressly contemplated sending Turcios's case to the jury and having Arevalo and Menjivar "stand trial again." JA2098. After a brief recess, the court chose to instead give a cautionary instruction, pointing to "the use of judicial resources, the amount of time that's been invested in this case." JA2100; *see also* JA2101 ("we've invested too much time in this case"). But even then, the trial court indicated a willingness to grant Arevalo and Menjivar relief if they were convicted.

The court noted that counsel for both men had presented strong closing arguments, and added, "this certainly makes the case vulnerable down the road. Depending on what the jury does, of course. But if they do convict, it does create issues down the road, *but there are always other post-trial ways in which that can be resolved, all right*?" JA2101 (emphasis added). Thus, even at the time of the cautionary instruction, the district court was dubious about the remedy. And when Turcios asked the court to amend the instruction, the court noted the argument's strong emotional tenor and that it had been "an inappropriate closing argument almost from the beginning." JA2102.

Of course, Arevalo and Menjivar were subsequently convicted of mandatory

life charges. Both men filed new trial motions, again raising this issue. Months

after closing arguments, the court's uncertainty had not dissipated. The court

described the argument as "way beyond the bounds" and agreed with Arevalo that

"had the government made that kind of an argument, that would have been *clear

reversible error*. It would have been an absolute travesty." JA2459 (emphasis

added). The court then described its qualms about the convictions:

> And the problem this created for the Court was at the end of a very long
> trial with a whole lot of witnesses, some of whom are relatively
> sensitive witnesses, you injected an issue into the case that made it
> extremely difficult to see whether or not the case could go forward.  I
> still am wrestling with this issue because I do think it created a huge
> problem.

JA2460. The court also admonished the government "as officers of the Court, you

also have to be mindful, as much as you would like not to have to retry this case,

whether in the interests of justice, it ought to be retried because of what happened."

JA2459. These are not the statements of a court that has confidence in its

cautionary instruction.

*Second*, the government admits how outrageous Turcios's argument was. At

trial, government never defended the argument or claimed its impact was trivial.

Later, the government characterized the argument as "replete with arguments that

we believe were improper," and argued that it would have been impossible to

parse. JA2461–62. Even Turcios's counsel noted that she had "no objection to Mr. Arevalo or Mr. Menjivar getting a new trial." JA2458.

*Third*, if there is any doubt that both parties recognized the devastating impact of the closing, this Court need only review the Government's Brief in *United States v. Carlos Turcios Villatoro*, No. 24-4358 (Jan. 14, 2025) (Doc. 38). In that brief, the government admits that "counsel improperly commented on Turcios's decision not to testify, vouched for a witness, emphasized testimony inculpating a co-defendant, and argued facts not in evidence. Taken together, these improprieties *infected the entire closing argument*." *Id.* at 25–26 (emphasis added).

The government first agrees that Turcios's comments on his decision not to testify were "improper," noting that "courts have enforced the rule . . . against defendants too, particularly where one defendant creates a risk of prejudice to another." *Id.* at 31–32 (citing *United States v. De La Cruz Bellinger*, 422 F.2d 723, 726 (9th Cir. 1970); *United States v. Mena*, 863 F.2d 1522 (11th Cir. 1989); *Coleman v. United States*, 420 F.2d 616, 625 (D.C. Cir. 1969)). The government observes that the "comments were particularly improper when considered in the context of the rest of Turcios's closing," in which Turcios's counsel "repeatedly suggested" Arevalo's guilt and "create[d] an additional contrast between Turcios and Arevalo" due to Arevalo's English fluency. *Id.* at 31–32 (citing *United States v. Batjargal*, 302 F. App'x 188, 191 (4th Cir. 2008) ("'Comments made during a

trial regarding a defendant's decision not to testify may be harmful if the

comments invite the jury to infer guilt from the defendant's decision not to

testify.'")).

The government next agrees that Turcios's counsel improperly vouched for

a witness, noting that "the context in which Turcios's counsel vouched for

Figueroa shows why the rule against vouching applies to defense attorneys, too."

*Id.* at 34–35.  As the government describes, Turcios's counsel vouched for a

witness who was inculpatory to his codefendants, and in the process "added the

imprimatur of an officer of the court to bolster the credibility of a witness and her

testimony."  *Id.*

Additionally, the government rightly argues that "[c]ounsel improperly tried

to exculpate Turcios by inculpating Arevalo for the first time during closing."  *Id.*

at 35. "[T]he government agrees that the closing argument was 'the first anybody'

'was put on notice' that Turcios would seek to assert his innocence by pointing the

finger at Arevalo and suggesting that the murders happened somewhere else."  *Id.*

at 35. As the government notes, it is deeply problematic "when the 'defense' being

advanced emphasizes, for the first time, a co-defendant's guilty after that co-

defendant has rested and presented closing argument."  *Id.* at 36; *see also United

States v. Wilson*, 155 F.3d 291, 298–99 (4th Cir. 1998). Moreover, "[t]here is a

substantial difference . . . between saying 'this witness didn't say my client did it,' and 'this witness credibly said a co-defendant did it.'" *Id.* at 37.

Finally, the government admits that Turcios's "[c]ounsel improperly asserted facts not in evidence," including showing a photograph of a different gas station, claiming there was a dumpster there, and arguing that Guevara and Arevalo had killed the victims there. *See id.* at 37–38. Perhaps most importantly, the government admits that the trial court could never "have isolated and struck any improper statements[.]" *Id.* at 45. As the government rightly argues:

> [M]ultiple improper statements can have cumulative effects on the jury, and . . . an improper statement can infect an otherwise proper statement. To take one example, standing alone, it may have been appropriate for counsel to end the closing by inviting the jury to "remember Karen Figueroa." JA3862. But when considered in the context of counsel's repeated efforts to tell the jury that Figueroa was credible, that reminder was improper.

*Id.* In sum, the government asserts, the argument of Turcios's counsel was "admittedly unusual" in that it was "a presentation that a trial judge with decades of experience on the federal bench finds to be entirely unprecedented and 'way beyond the bounds' of 'an appropriate closing argument.'" *Id.* at 45–46.

*Fourth*, the assumption that a curative instruction could cure prejudice is unwarranted here. There are bells that cannot be unrung. For example, in *Stewart v. United States*, 366 U.S. 1 (1961), the jury learned that the defendant had "failed to testify in his prior trials." *Id.* at 7. A defense motion for a mistrial was denied. On

30

appeal, the government argued "the conviction should be allowed to stand on the theory that the error was not sufficiently prejudicial to warrant the granting of a mistrial and the defense made no request for cautionary instructions." *Id.* at 9–10. The Supreme Court disagreed, explaining:

> the danger of the situation would have been increased by a cautionary instruction in that such [an] instruction would have again brought the jury's attention to petitioner's prior failures to testify. Plainly, the defense was under no obligation to take such a risk. The motion for a mistrial was entirely appropriate and, indeed, necessary to protect the interests of petitioner.

*Id.* at 11. In other words, there are circumstances where a curative instruction is insufficient, including when the error is a comment on the defendant's decision not to testify.

Indeed, the Supreme Court has recognized that the presumption that cautionary instructions work is a matter of policy, not reality. "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *see also Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction."); *Bruton v. United States*, 391 U.S. 123, 135 (1968) ("there are some contexts in

31

which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure to vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."). Thus, although the government relies on the presumption, it offers no argument for how the jury could follow the instruction *in this case*. It would be hard for the government to do so, given the government's recognition that the closing in this case was infected with numerous improper arguments that could never be parsed out.

This case is analogous to *Bruton*, where the Supreme Court described the following context in which a jury could not be expected to follow a cautionary instruction:

> Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

*Id.* at 135–36. In this case, similarly, the jury was exposed to "powerfully incriminating extrajudicial statements of a codefendant" in a joint trial. Although the mechanism was different, counsel for Turcios claimed to be "tell[ing] his story." JA2063–64. Counsel for Turcios then proceeded to tell a story of Arevalo's guilt, one that Turcios's codefendants could not test by cross-examination.

If anything, this circumstance is more prejudicial than that in *Bruton*, for at least four reasons. First, in this case, Arevalo and Menjivar were not only unable to cross, but also unable to argue against Turcios's alleged "story." Indeed, counsel for Turcios made sure to close last, making it impossible for any codefendant to answer. *See United States v. Wilson*, 135 F.3d 291, 298–99 (4th Cir. 1998) (granting new trial where improper argument "came as a last-minute surprise," leaving the defense "blindsided when it was too late to investigate the matter and present a defense.").

Second, although counsel claimed she was offering Turcios's story, there is no evidence that Turcios made any of the claims his counsel did. Indeed, there was no evidence *at all* to support counsel's "story," which cited to "facts" not in the record and relied on a blurry copy of a photograph that did not show what counsel claimed.

Third, because Turcios's story was told by a lawyer, it carried—as the government has argued—the "imprimatur of an officer of the court." There is no reason that imprimatur would apply only to counsel's vouching. On the contrary, the jury had every reason to believe that when counsel claimed to be telling Turcios's story, she was doing so.

Finally, counsel's argument came at the end of a trial in which the defense teams had worked together. The government argues that the jury might not have

33

credited the defense teams' joint presentation. *See* Response at 73. Arevalo and

Menjivar disagree, but that is beside the point. The point is that the jury viewed the

whole trial, not just the closing. Specifically, the jury saw the defense teams work

together to present the case that Guevara's story about how he, Arevalo, and

Turcios found the victims was incredible. The defendants focused on the

impossibility that Arevalo heard Beltran's voice at the dumpster behind the Exxon,

as Guevara claimed. After that presentation, and after Arevalo and Menjivar

closed, Turcios's counsel suddenly switched gears, claiming to "speak for Carlos."

JA2068. Offering a blurry photograph that was not in evidence, counsel offered a

new claim that Guevara and Arevalo had found and killed the victims at a

completely different gas station. *See* JA2068–69.

  As the defense argued, Turcios's "suggestion is that they have learned this

story through collaborating with us, and that they're sort of unveiling that for the

jury at the last moment." JA2452. This suggestion was "offensive," "untrue," and

"calculated to make sure that [the co-defendants did not] have an opportunity to

respond." JA2452. The prejudice caused by this scenario was unique, and the

government has never articulated an argument for how the jury could overcome it.

Moreover, the government has not meaningfully responded to the contention that

this collaboration made it impossible for the jury to discount only Turcios's

arguments, while giving the others weight. In these circumstances, where the

defendants made a joint presentation before being ambushed by a surprise second prosecutor, it is impossible to believe that the jury could put aside one closing without drawing negative inferences about the other defendants for working with Turcios.

Lastly, the government urges this Court to deny relief on the basis that there was "overwhelming" evidence of Arevalo's and Menjivar's guilt. Response at 65. The government's brief, however, belies this contention. As discussed *supra*, the government relied almost exclusively on the testimony of Guevara to convict Arevalo and Menjivar. *See* Response 65–67 (relying primarily on citation to Guevara's testimony). But Guevara was a flawed witness with significant reasons to deny, distort, and shift blame, and there was little corroboration of his testimony.

Beginning with Menjivar, there was vanishingly little evidence of his guilt of VICAR murder in connection with Beltran's death. Before trial, Guevara had told the government that Menjivar was *not* the person pushing the clique to commit murders. JA1253. Guevara admitted that Menjivar was more focused on the drug business, and that violence was "bad for the drug business." JA1257. In contrast, Guevara admitted that Melvin Canales Saldana—a codefendant tried separately— was more interested in the clique committing homicides. JA1258. Canales complained to Guevara about Menjivar, particularly because Menjivar "was not pressuring us" to "kill people." JA1258–59. Meanwhile, Menjivar expressed

35

concern about Canales, telling Guevara that he was "creat[ing] chaos within the clique." JA1261. Although there was evidence that Guevara and Menjivar exchanged messages *after* the double murder, there was no corroboration for Guevara's allegation that Menjivar had "greenlit" Beltran's murder.

Similarly, the evidence against Arevalo was far from overwhelming. The government relied on Guevara, whose claims were uncorroborated by any physical evidence such as DNA, fingerprints, toolmarks, or cell site location information. The jury did not fully credit Guevara, as evidenced by the fact that it acquitted Arevalo of every substantive charge relating to the Tate murder, which Guevara also accused him of committing. Indeed, the government's heavy reliance on Guevara is problematic given that one of the main issues with Turcios's closing was the surprise way in which it eviscerated defense evidence that *Guevara* was lying about the double murder.

The government cites no evidence corroborating Guevara's claims except for a single WhatsApp message, which cannot bear the weight the government puts on it. Response at 66–67. Although there was evidence of Arevalo's inclusion in a gang "report" about the double murder, JA3841–42, that is relatively insignificant in MS-13. In this case, the government's own gang expert testified that MS-13 members take credit for crimes that they did not commit to help them build a reputation and rank up. SA95. Indeed, the government's *own theory* of this case

was that Molina had falsely taken credit for the double murder, making it impossible for the government to seriously contend that such an action constitutes "overwhelming" evidence.

### 4. The Special Findings Are Unconstitutional.

The government's defense of the special findings in Count 1 is also unavailing. *First*, any fact that increases the range of possible punishment must be found by a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The government does not contest that the special findings in Count 1 increased the range of possible punishment from a twenty-year maximum to life in prison. Thus, there can be no argument that the special findings are exempt from basic Sixth Amendment requirements.[8]

*Second*, the government fails to explain how the use of "yes and no" for the special findings—as opposed to "guilty and not guilty"—could be perceived by the jury as anything other than a lesser burden. "As [this Court] ha[s] explained, 'the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and *draw the ultimate conclusion of guilt or innocence*.'"

---

[8] Although the government notes that Arevalo did not make this objection to the verdict form, the government does not argue that this issue has been procedurally defaulted. Arevalo raised this issue in his motion for a new trial, and the government responded on the merits, never asserting that he had failed to preserve it. Response at 76–77.

*United States v. Ramirez-Castillo*, 748 F.3d 205, 214 (4th Cir. 2014) (quoting

*United States v. Gaudin*, 515 U.S. 506, 514 (1995)) (emphasis added). Just as in

*Ramirez-Castillo*, "the district court erred when it treated the jury as a mere fact

finder . . . and thereby prevented the jury from making the ultimate, indispensable

conclusion of whether Appellant was guilty or not guilty." *Id.* No defendant should

serve a life sentence without a finding of guilt beyond a reasonable doubt, and no

such finding was ever made against Arevalo in relation to the Tate homicide.

## CONCLUSION

Appellants respectfully ask this Court to find that the district court erred

based on the rulings in this case, and to overturn their convictions.

Respectfully Submitted,

/s/ Bernadette Mary Donovan
Bernadette Mary Donovan
Donovan & Engle, PLLC
1134 East High Street, Unit A
Charlottesville, Virginia  22902
(703) 895-3846

*Counsel for Appellant Arevalo*

Lawrence Hunter Woodward, Jr.
Ruloff, Swain, Haddad, Morecock,
Talbert & Woodward, P.C.
317 30th Street
Virginia Beach, Virginia  23451
(757) 671-6000

*Counsel for Appellant Menjivar*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of
the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure
statement, table of contents, table of citations, statement regarding oral
argument, signature block, certificates of counsel, addendum, attachments):

     [ X ] this brief contains [8,880] words.

     [    ] this brief uses a monospaced type and contains [*state the number of*]
lines of text.

2.      This brief complies with the typeface and type style requirements because:

     [ X ] this brief has been prepared in a proportionally spaced typeface using
[*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

     [    ] this brief has been prepared in a monospaced typeface using [*state
name and version of word processing program*] with [*state number of
characters per inch and name of type style*].


Dated:  <u>August 7, 2025</u>         <u>/s/ Bernadette Mary Donovan</u>
                                      *Counsel for Appellant Arevalo*